**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: October 1, 2024

S24A0525.  PIERCE v. THE STATE.

COLVIN, Justice.

Appellant Lavarr Rasheed Pierce appeals his convictions for malice murder, arson in the first degree, and a violation of the Street Gang Terrorism and Prevention Act ("Gang Act") in connection with the shooting death of Quincy Suggs.[1] On appeal, Appellant argues

---

[1] Suggs was shot and killed on September 16, 2014. On October 21, 2015, a Clayton County grand jury jointly charged Appellant, Khadijah Jenkins, Frederick Rosenau, and Julius Lofton with malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), arson in the first degree (Count 4), and violations of the Gang Act predicated on aggravated assault and arson in the first degree (Counts 5 and 6, respectively). Pursuant to a negotiated plea agreement, Lofton pled guilty to voluntary manslaughter as a lesser offense of malice murder and testified against the other co-defendants at their trial.

Appellant, Jenkins, and Rosenau were jointly tried before a jury from November 13 through 27, 2017. The jury found Appellant guilty of Counts 1 through 5 and not guilty of Count 6, Jenkins guilty of Counts 3 and 5 and not guilty of Counts 1, 2, 4, and 6, and Rosenau guilty of Counts 2, 3, and 5 and not guilty of Counts 1, 4, and 6. The trial court sentenced Appellant to life without the possibility of parole for malice murder (Count 1) and imposed consecutive prison terms of 20 years and 15 years for Counts 4 and 5,

that the trial evidence was constitutionally insufficient to support his convictions. He also raises numerous claims of trial court error, prosecutorial misconduct, and ineffective assistance of counsel. For the reasons below, we reject Appellant's claims of error and affirm his convictions.

1.     This case arises from the killing of a "john" during his visit to a house occupied by prostitutes and high-ranking gang members. The trial evidence showed the following. The State's gang expert, Sergeant Brandon McKay, testified that the Luxiano gang was a set of the Nine Trey Bloods gang.[2] He said that the gangs had

respectively. The court merged Appellant's aggravated-assault charge (Count 3) with Count 1 for sentencing purposes. And although the court purported to merge Appellant's felony-murder count (Count 2) with Count 1, that count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993).

Appellant filed a timely motion for new trial, and he amended and supplemented the motion through new counsel. The trial court held hearings on the motion for new trial on September 2, 2020, and on February 10, 2022. On March 4, 2022, the trial court denied Appellant's motion for new trial. Appellant timely filed a notice of appeal directed to this Court, and the case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

[2] Sergeant McKay was qualified as an expert in gang investigations based on his experience investigating hundreds of gang cases as part of the F.B.I. Gang Task Force and the Clayton County Police Department's Gang Unit. He testified that he had personally investigated cases involving Nine

a rank structure, that Frederick Rosenau had "a very high rank" in the Nine Trey Bloods with authority over the Luxiano set, and that Julius Lofton, who started the Luxiano set, and Appellant were both highly ranked members of the Luxiano set. He further testified that the Nine Trey Bloods and the Luxiano set wore red clothing and used specific hand signs to signal their gang affiliation. Referring to a photograph introduced into evidence, he testified that Appellant could be seen flashing one such hand sign alongside several other known gang members.

Sergeant McKay testified that he had arrested Luxiano gang members for many types of violent crimes, including armed robberies. He said that members could get promoted within the gang by committing armed robberies, and that the proceeds from armed robberies went toward members' monthly gang dues. He also said that prostitution was one of the primary ways the Luxiano made money, that almost every female associated with the group engaged

Trey Bloods in Clayton County, that he had participated in a three-and-a-half-year-long investigation of the Luxiano gang, and that he had arrested more than 20 Luxiano members for crimes including armed robberies and shootings.

in prostitution, and that members of the gang would sometimes use prostitutes to lure victims to a location where gang members could rob or carjack them.

Consistent with Sergeant McKay's testimony, Lofton testified that he had started the Luxiano gang as a set of the Nine Trey Bloods, and that the Luxiano set had approximately 80 members at its peak. Lofton said that Rosenau was the "low," meaning Rosenau was a Nine Trey Bloods member with a higher rank than Lofton within the Nine Trey Bloods. Lofton further testified that he was the "fourth floor," the highest ranked leader of the Luxiano set, and that Appellant and his brother were lower ranked Luxiano members, with Appellant's brother "unofficially" being the "third floor" and Appellant being the "second floor." Lofton said that Briana Davis was the mother of his child, and that she worked for him as a prostitute. Lofton also identified Jenkins as a Luxiano member who dated Rosenau. And while Tequila Forehand, another Nine Trey Bloods member, hesitated when asked if Jenkins worked for Rosenau as a prostitute, she testified that Jenkins would "do

4

anything [Rosenau] asked her to" and that she had seen Jenkins give money to Rosenau on more than one occasion.

Lofton testified that he was aware that Luxiano gang members were robbing men who came to see female gang members engaged in prostitution, and that Luxiano members paid him monthly dues, which were turned over to higher ranking Nine Trey gang members. Lofton further testified that he witnessed "the end part" of one such robbery incident, in which two Luxiano members known as "Jabo" and "Man-Man" robbed a man who had visited an apartment to purchase sex from a female Luxiano known as "Jippy." The robbery victim in that incident testified that he had paid Jippy for sex on one occasion, and that, when he visited her a second time, two men robbed him at gunpoint.

As specifically relevant to the killing of Suggs, Lofton and Davis each testified that they were staying at Jenkins's mother's house with Rosenau and Jenkins for a period of time in September 2014, and that during that period Davis engaged in prostitution and gave the money she earned to Lofton. Davis testified that Jenkins

was also engaging in prostitution in the house, and that Jenkins's earnings went to Rosenau.

Lofton testified that, on the night before Suggs's death, Appellant came to the house and talked to Lofton in Rosenau's presence about robbing the "johns" coming to the house for sex. According to Lofton, he told Appellant that he "didn't care if . . . it went on," and Rosenau did not say anything. Lofton testified that, after the conversation, he went to sleep.

Davis testified that she had advertised her services online and that Suggs had responded to her advertisement via text message, asking to spend some time with her. They agreed to meet up, and, on the morning of September 16, 2014, Suggs visited Jenkins's mother's house, had sex with Davis, paid her, and then left. Davis said that, later that morning, Suggs called her because he wanted to come back "to chill," and she invited him to come back with "[s]ome weed." In the meantime, Davis testified, Appellant arrived at Jenkins's mother's house and went inside.

According to Davis, when Suggs arrived the second time,

6

Rosenau, Lofton, and Jenkins were asleep, and Appellant was the only other person awake in the house. Davis testified that she went outside to meet Suggs at his car, and Suggs asked to use the bathroom in the house, which she gave him permission to do. Davis said that, a few minutes after Suggs went inside the house, she heard a gunshot.

Lofton also heard a gunshot, testifying that he "woke up to a gunshot" and then ran out of the bedroom to see Appellant standing with a gun in his hand "[r]ight next to" Suggs's dead body, which was lying face down on the floor near "a lot" of $20 bills.[3] According to Davis, following the gunshot, Appellant came outside holding a handgun, followed by Rosenau, Jenkins, and Lofton. Davis testified that Appellant gave the gun to Rosenau. And according to both Davis and Lofton, Appellant then drove away in his own car while the rest of the group drove away in another car.

Lofton said that they drove to his brother's apartment. Davis

---

[3] Lofton later testified that Lofton "could have" startled Appellant when Lofton came out of the bedroom, causing Appellant to fire the gun.

testified that, during the car ride, Rosenau said that Appellant killed Suggs.[4] According to Lofton, Appellant came over to the apartment later that day, asked Lofton if Lofton thought Jenkins and Davis were going to say anything about the shooting, and told Lofton that "[i]t was taken care of" and "we was going to be good." When asked about efforts to conceal the crime, Forehand testified that Rosenau later told her that "the house was burnt down."[5] And Lofton testified that he had pled guilty to voluntary manslaughter in the case because his "gang related" "actions led up to the death of [Suggs]."

At some point during the day of Suggs's shooting, police officers and firefighters were dispatched to Jenkins's mother's house, where they discovered that the house was on fire and producing thick black smoke. Firefighters entered the burning house to search for victims and found Suggs's dead body lying in the den area.

---

[4] According to Forehand, however, Rosenau later told her "he had shot [a] man in the back of the head" while inside Jenkins's mother's house.

[5] Forehand further testified that Rosenau knew Jenkins planned to talk to the police and that he told Forehand to "kill [Jenkins] if his name came up" in connection with the shooting.

Based on Suggs's injuries and the absence of soot in his airways, a medical examiner concluded that Suggs had died before the fire started from a single gunshot wound to the back of his neck that was fired from "less than half an inch away" and that injured his spine and fractured his jaw. And an arson investigation revealed both that an accelerant had been used in the house and that the fire had three separate points of origin.

2. Appellant contends that the trial evidence was constitutionally insufficient to support his convictions for malice murder, arson in the first degree, and a violation of the Gang Act. We disagree.

"Evidence is sufficient as a matter of constitutional due process if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Payne v. State*, 318 Ga. 249, 252-253 (2) (897 SE2d 809) (2024) (citation and punctuation omitted). When reviewing the sufficiency of the evidence, we "view[ ] the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. at 253

(2) (citation and punctuation omitted).

First, the trial evidence was constitutionally sufficient to support Appellant's malice-murder conviction. "A person commits the offense of [malice] murder when he unlawfully and with malice aforethought . . . causes the death of another human being." OCGA § 16-5-1 (a). Here, Lofton testified that, right after hearing a gunshot, he found Appellant standing with a gun over Suggs's dead body, and Davis testified that, after hearing a gunshot, she saw Appellant exit the house with a gun. Thus, the evidence authorized a jury finding that Appellant caused Suggs' death. And the jury was authorized to find that Appellant deliberately intended to kill Suggs based on the medical examiner's testimony that Suggs had been shot through the back of his neck from "near contact range," and the testimony of Lofton and Davis that Appellant quickly fled the scene. See *Ford v. State*, 319 Ga. 215, 218 (1) (903 SE2d 1) (2024) (holding that, even though "there was money left behind at the scene of the crime," trial evidence showing that the victim "was shot in [the back of] the head while [the appellant] was in the house and that [the

appellant] left the scene without rendering aid" "was plainly sufficient to support [the appellant's] murder conviction"); *Moran v. State*, 302 Ga. 162, 164 (1) (b) (805 SE2d 856) (2017) (evidence of malice murder was sufficient where, among other things, the "appellant shot the victim in the back of the head at [close] range").

The trial evidence was also constitutionally sufficient to support Appellant's arson conviction. "A person commits the offense of arson in the first degree when, by means of fire or explosive, he or she knowingly damages or knowingly causes, aids, abets, advises, encourages, hires, counsels, or procures another to damage" a "dwelling house of another without his or her consent." OCGA § 16-7-60 (a) (1).

Here, the trial evidence authorized the jury to find Appellant guilty of committing the arson of Jenkins's mother's house. Specifically, the arson investigation showed that fires were set in three separate locations around Jenkins's mother's house, while Suggs's dead body was inside, and that an accelerant had been used. And Lofton's testimony that Appellant met up with the rest of the

11

group later in the day and told Lofton that "[i]t was taken care of" and "we was going to be good" supported an inference that Appellant had set those fires to cover up evidence of the shooting. See *Coleman v. State*, 301 Ga. 753, 754 (1) (804 SE2d 89) (2017) (sufficient evidence to support malice-murder and arson convictions where the evidence showed that the defendant and co-conspirators planned to rob the victim; the defendant shot the victim, put the victim in the trunk of a car, transported a gas can to and from the car's location, and then told the co-conspirators that things "had been taken care of"; and the victim's body was found inside the burning car). See also *Kitchens v. State*, 310 Ga. 698, 699-701 (1) (854 SE2d 518) (2021) (sufficient evidence of malice murder and arson where two victims were found in a burning house stabbed to death, the house fire had more than one point of origin, and the evidence showed that the defendant had been inside the house and was romantically obsessed with one of the victims); *Parker v. State*, 277 Ga. 439, 439 (1) (588 SE2d 683) (2003) (sufficient evidence of malice murder and arson where the evidence showed that the victim died from gunshots to

the head before her mattress was intentionally set on fire and the defendant was seen leaving the victim's home before the house fire was discovered).

Finally, the trial evidence was constitutionally sufficient to prove that Appellant committed the charged violation of the Gang Act predicated on the aggravated assault of Suggs with a deadly weapon. The Gang Act makes it "unlawful for any person . . . associated with a criminal street gang to . . . participate in criminal gang activity through the commission of" certain enumerated offenses. OCGA § 16-15-4 (a). To establish a violation of OCGA § 16-15-4 (a), the State is required to prove four elements:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the gang.

*Rooks v. State*, 317 Ga. 743, 753 (2) (893 SE2d 899) (2023) (citation

13

and punctuation omitted).

The trial evidence authorized the jury to find each of these elements. First, ample trial evidence showed the existence of a criminal street gang. Lofton, the founding member of the Luxiano gang, and Sergeant McKay each testified that Lofton had started the Luxiano gang as a set of the Nine Trey Bloods, that the Luxiano had many members and a rank structure, and that gang members were known to engage in various crimes, including armed robbery. See *Rooks v. State*, 317 Ga. 743, 753 (2) (893 SE2d 899) (2023) (holding that there was sufficient evidence showing the existence of a criminal street gang where gang experts testified that "the Gangster Disciples was a structured, 'traditional' gang and that members committed an array of criminal activity, including drug trafficking, fraud, robbery, assault, and murder").

Second, the trial evidence showed that Appellant was a member of the Luxiano gang, as Lofton and Sergeant McKay each testified that Appellant was a highly ranked member of the gang, and a photograph introduced into evidence showed several known

14

gang members with Appellant, who could be seen flashing a hand sign known to signal affiliation with the gang. See *Rooks*, 317 Ga. at 753 (2) (holding that there was sufficient evidence of the defendant's association with the gang where the evidence showed that the defendant "made hand signs associated with the Gangster Disciples").

Third, the trial evidence showed that Appellant had committed an enumerated criminal offense, namely, the aggravated assault with a deadly weapon of Suggs. Specifically, Lofton's testimony that Appellant talked about wanting to rob the "johns" visiting Jenkins's mother's house, together with the testimony of Lofton and Sergeant McKay that members of Appellant's gang were known to commit armed robberies of "johns," authorized a jury finding that Appellant planned to commit an armed robbery of a "john" at Jenkins's mother's house. Davis's testimony that Suggs had paid her for sex at Jenkins's mother's house supported a finding that Suggs was one such "John." And Lofton's testimony that he found Appellant standing with a gun over Suggs's dead body and many $20 bills

authorized a jury finding that Appellant had committed an aggravated assault of Suggs by shooting him in the process of committing a robbery. See *Hayes v. State*, 298 Ga. 339, 343-344 (b) (781 SE2d 777) (2016) (holding that there was sufficient evidence that the appellant's co-defendants committed aggravated assaults where the co-defendants "intentionally fir[ed] guns at [three people] without justification — striking and killing [one of them]").

Finally, the jury was authorized to find that the aggravated assault was intended to further the gang's interests. Specifically, Lofton's and Sergeant McKay's testimony showed that gang members were known to commit armed robberies of "johns," and Sergeant McKay testified that the proceeds from armed robberies helped gang members pay their monthly gang dues. See *Butler v. State*, 310 Ga. 892, 897-898 (1) (b) (855 SE2d 551) (2021) (holding that there was sufficient evidence that shootings were committed with an intent to further the gang's interests where "there was evidence that the gang used prostitution and robbery of 'johns' to finance the gang and that the shootings resulted from that sort of

activity"); *Stripling v. State*, 304 Ga. 131, 134 (1) (b) (816 SE2d 663) (2018) (holding that there was sufficient evidence that the crime was intended to further the gang's interests where "[a] gang expert testified that the gang ma[de] most of its money through armed robberies, including robberies of drug dealers like" the one at issue in the case). Accordingly, this claim of error fails.

3.    Appellant argues that the trial court abused its discretion under OCGA § 24-4-403 ("Rule 403") in allowing the State's gang expert, Sergeant McKay, to give testimony at trial. See OCGA § 24-4-403 (providing that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). According to Appellant, none of Sergeant McKay's testimony had probative value because there was "no evidence" that any of the crimes were "gang-related or gang-motivated," and Sergeant McKay's testimony about Appellant's gang membership was "highly prejudicial" because it put Appellant's character at issue.

Appellant has not shown that any unfair prejudice from

Sergeant McKay's testimony substantially outweighed the testimony's probative value. As explained in the prior division, and contrary to Appellant's argument, there was evidence that the crimes were gang related, and Sergeant McKay's testimony was probative as to each element of the Gang Act charge, helping prove the existence of the Luxiano gang and that Appellant was a member of the gang, was motivated to commit an enumerated offense, and committed the offense with the intent to further the gang's interests.

Appellant claims that Sergeant McKay's testimony about his gang membership in particular was highly prejudicial. But to the extent that Sergeant McKay's testimony helped establish Appellant's gang membership — an element of a Gang Act violation — it was prejudicial only in the sense that it was inculpatory. See *Henderson v. State*, 317 Ga. 66, 74 (3) (891 SE2d 884) (2023) (noting that "all incriminating evidence is [prejudicial]" and that "*[u]nfair* prejudice generally refers to the tendency of evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or to suggest decision on an improper

18

basis" (citation and punctuation omitted; emphasis supplied). See also *Jackson v. State*, 306 Ga. 706, 710 (2) (832 SE2d 809) (2019) (holding that certain "evidence was not improper character evidence" but rather "showed [the defendant's] association with the Bloods and was, therefore, vital to the State's case regarding the Street Gang Act allegations"); *Lupoe v. State*, 300 Ga. 233, 245 (8) (794 SE2d 67) (2016) (noting that "evidence of [the defendant's] prior participation in gang activities was directly relevant to an element of the State's case [regarding a charged Gang Act violation] and did not constitute improper character evidence when admitted for that limited purpose"). And even assuming that Sergeant McKay's testimony about Appellant's gang membership somehow suggested that Appellant had a propensity to commit violence, any risk of unfair prejudice from such testimony did not substantially outweigh its probative value. Because Sergeant McKay was one of only two witnesses who could confidently say that Appellant was a Luxiano gang member, and the State could not prove that Appellant violated the Gang Act without evidence establishing Appellant's association

with the gang, the probative value of Sergeant McKay's testimony was high. Accordingly, Appellant has not shown that the trial court abused its discretion in permitting Sergeant McKay to testify.

4. Appellant argues that the trial court abused its discretion in admitting testimony from the State's gang expert, Sergeant McKay, about other gang members' prior bad acts, when those other gang members did not testify about those acts at Appellant's trial. According to Appellant, such testimony violated Appellant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution, which prohibits the admission of "testimonial" statements against a criminal defendant unless the declarant is "unavailab[le]" to testify and the defendant had "a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (124 SCt 1354, 158 LE2d 177) (2004). See also U. S. Const., Amend. VI (providing that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him").

For support, Appellant cites *Kirby v. United States*, 174 U.S.

47 (19 SCt 574, 43 LE 890) (1899), which held that the Confrontation Clause prohibits the government from admitting the records of conviction of non-testifying third parties as a substitute for testimony against a defendant to establish an element of a criminal charge against the defendant. See id. at 60-61. And Appellant also cites *State v. Jefferson*, 302 Ga. 435 (807 SE2d 387) (2017), which relied on *Kirby* to hold "that OCGA § 16-15-9[6] is unconstitutional on its face to the extent that it authorizes the admission of the [records of] convictions of non-testifying non-parties as evidence of a criminal street gang." Id. at 437, 440-441. According to Appellant, "*Kirby* is controlling in this case[.]"

Here, we are unable to meaningfully analyze the merits of Appellant's claim because we cannot clearly discern what the claim is, based on Appellant's citations to the record and his arguments.

---

[6] In relevant part, OCGA § 16-15-9 provides:

For the purpose of proving the existence of a criminal street gang and criminal gang activity, the commission, adjudication, or conviction of any offense enumerated in paragraph (1) of Code Section 16-15-3 by any member or associate of a criminal street gang shall be admissible in any trial or proceeding.

Although Appellant alleges that the Confrontation Clause prohibited Sergeant McKay from testifying about non-testifying gang members' prior bad acts, Appellant has not specifically identified the testimony from Sergeant McKay that he contends was objectionable under the Confrontation Clause. Rather, Appellant cites as objectionable 133 out of the 134 pages of the trial transcript on which Sergeant McKay's testimony appears. As described above, Sergeant McKay's testimony touched on a wide variety of matters, and he testified about gang members' conduct at different levels of generality, addressing, among other things, the gang's general mode of operation, general categories of crimes engaged in by gang members, and investigations of specific gang-related crimes.

It is not self-evident which testimony in particular Appellant contends violated the Confrontation Clause. This is particularly true because, although Appellant's reliance on *Kirby* and *Jefferson* suggests that the target of his Confrontation Clause challenge may be the admission of certified copies of gang members' convictions introduced through Sergeant McKay, it does not appear that the

State introduced any records of conviction through Sergeant McKay.[7] Further, although Appellant makes a vague assertion that unspecified testimony from Sergeant McKay about other gang members' prior criminal conduct was improper because that testimony should have instead "come in through the [non-testifying] gang member(s)," he does not argue that Sergeant McKay's testimony was based on statements made by those non-testifying gang members. Nor does he include any meaningful analysis explaining why any statements by non-testifying gang members that Sergeant McKay may have relied on were testimonial in nature, such that their admission through Sergeant McKay violated the Confrontation Clause.

"It is not this Court's job to cull the record on behalf of [an] [a]ppellant to find alleged errors[.]" *Henderson v. State*, 304 Ga. 733, 739 (4) (822 SE2d 228) (2018) (citation and punctuation omitted). Because Appellant has not "specifically identif[ied] the objectionable

_____

[7] Notably, the trial court found that Sergeant McKay did not testify about criminal convictions when it denied Appellant's motion for new trial on this ground, and Appellant has not pointed us to any such testimony.

testimony," has not "include[d] any meaningful legal analysis," and "simply makes vague assertions of error and cites to [one large] chunk[ ] of the transcript," he "is not entitled to a review of th[is] claim[ ]." Id.

5. Appellant contends that the trial court abused its discretion under OCGA § 24-4-404 (b) ("Rule 404 (b)") and Rule 403 when it admitted a robbery victim's testimony. As noted above, the robbery victim testified that, in January 2015, he was robbed at gunpoint by two men when visiting a woman from whom he had previously purchased sex. And Lofton, who testified that he was present for part of the robbery incident, identified the woman and two men who participated in the robbery as Luxiano gang members who were not on trial. As explained below, we conclude that the trial court did not abuse its discretion in admitting the robbery victim's testimony.

Rule 404 (b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." This

rule applies only to "extrinsic evidence" of other crimes, wrongs, or acts. *Heade v. State*, 312 Ga. 19, 24 (3) (860 SE2d 509) (2021). "[I]ntrinsic evidence" of a charged offense is not subject to Rule 404 (b) and "remains admissible even if it incidentally places the defendant's character at issue." Id. at 24-25 (3) (citation and punctuation omitted).

"The line between extrinsic and intrinsic evidence is not always a bright one," but, as a general matter, "intrinsic evidence" refers to "direct evidence of the charged crime," as opposed to "evidence of *other* crimes." *Roberts v. State*, 315 Ga. 229, 236 (2) (a) (880 SE2d 501, 506 (2022) (citation and punctuation omitted; emphasis in original). And in the Gang Act context, where the State is required to prove the existence of a criminal street gang that engages in certain enumerated offenses that constitute "criminal gang activity," we have clarified that evidence that the defendant or other members of his gang committed an offense constituting "criminal gang activity" is "directly relevant to an element of the State's case and d[oes] not constitute improper character evidence [subject to

Rule 404 (b)] when admitted for that limited purpose." *Lupoe*, 300 Ga. at 245 (8) (citation and punctuation omitted). See also *Jackson*, 306 Ga. at 710 (2) (holding that evidence showing the defendant's association with a gang "was not improper character evidence" but instead direct evidence of an element of the Gang Act charge); *Anthony v. State*, 303 Ga. 399, 409 (8) (811 SE2d 399) (2018) ("[The defendant] was charged with violating the Street Gang Act, so evidence of his participation in gang activities . . . was direct evidence of an essential part of several of the offenses with which he was charged.").

Here, assuming without deciding that this enumeration of error is preserved for ordinary appellate review, Appellant has not shown that the trial court abused its discretion in admitting the robbery victim's testimony. The State sought to introduce evidence of other gang members' crimes as intrinsic evidence directly relevant to the elements of a Gang Act violation, including the existence of a criminal street gang that engaged in criminal gang activity by committing certain enumerated offenses. See OCGA § 16-15-4 (a);

26

*Rooks*, 317 Ga. at 753 (2) (describing the elements of a Gang Act violation). And the trial court ruled that evidence of criminal gang activity would be admissible for that purpose.[8]

The robbery victim's testimony was key, intrinsic evidence relied on by the State to establish that the Luxiano gang engaged in criminal gang activity. Although Sergeant McKay and Lofton testified that they were aware of Luxiano gang members robbing "johns" and Lofton testified that he had witnessed "part" of the incident that the robbery victim testified about, the robbery victim's testimony helped establish that gang members had in fact committed an armed robbery. Thus, the robbery victim's testimony was intrinsic evidence that was "directly relevant" to the Gang Act charge, and it was admissible for that purpose notwithstanding Rule 404 (b). *Lupoe*, 300 Ga. at 245 (8).

---

[8] In its pretrial ruling, the trial court indicated that it would "give limiting instructions" informing the jury that evidence of prior gang activity "can't be used for character" if "requested." But defense counsel did not request a limiting instruction when the robbery victim testified, the trial court did not give a limiting instruction, and Appellant has not argued on appeal that the failure to give a limiting instruction was plain error.

Appellant argues that the trial court nevertheless abused its discretion in admitting the robbery victim's testimony because it should have been excluded under Rule 403. "[I]ntrinsic evidence must satisfy [Rule 403]," *Johnson v. State*, 312 Ga. 481, 491 (4) (863 SE2d 137) (2021), which provides in relevant part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," OCGA § 24-4-403. "[E]xclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." *Salvesen v. State*, 317 Ga. 314, 317 (2) (893 SE2d 66) (2023) (citation and punctuation omitted). And when we review a trial court's admission of evidence under Rule 403, "we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. (citation and punctuation omitted).

Here, Appellant has not shown that any unfair prejudice from the robbery victim's testimony substantially outweighed its probative value. Appellant argues that he was unfairly prejudiced by the testimony because it suggested that he "had a propensity to

commit crimes and therefore committed a crime in the instant case." But the trial evidence clearly established that Appellant had not participated in the armed robbery that was the subject of the robbery victim's testimony. Thus, although the robbery victim's testimony might have reflected poorly on the robbers' propensity to commit armed robberies — an issue that was irrelevant to the charges against Appellant and nonprejudicial to him — it did not support an inference that Appellant personally had a propensity to commit such crimes. And as a result, any risk of unfair prejudice was low.

Although "gang evidence may be prejudicial" as a general matter, "it is only when unfair prejudice substantially outweighs probative value that Rule 403 permits exclusion." *Butler*, 310 Ga. at 898 (2) (citation, punctuation, and emphasis omitted). And here, Appellant has not shown that the low risk of unfair prejudice substantially outweighed the probative value of the evidence, which as explained above, was a key piece of the State's case that the gang had engaged in criminal gang activity. See id. See also *Johnson v.*

29

*State*, 312 Ga. 481, 493 (4) (863 SE2d 137) (2021) (concluding that, because evidence of a prior bad act had "significant probative value" in establishing a connection between the appellant, his gang affiliation, and the charged crimes, "it was not a matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (citation and punctuation omitted)).

6.    Appellant argues that the trial court abused its discretion in failing to conduct an inquiry to determine whether a juror who was found sleeping for a portion of the trial should have been removed. As explained below, however, this enumeration of error is not preserved for appellate review.

The record shows that, on the first day of trial, the court informed trial counsel that a juror had been sleeping after lunch, that the court, through the bailiff, had advised the juror that he needed to stay awake, and that the bailiff was getting the juror water and coffee. Appellant's counsel stated, "All right. So, we'll monitor the situation." And the court agreed, saying, "We'll keep an eye on it." The record does not indicate that the problem persisted

or that any further action was taken. And at the motion-for-new-trial hearing, trial counsel testified that the juror fell asleep only once, and that there was no need to approach the juror about the issue again.

Appellant argues that, "[o]ut of an abundance of caution," the trial court should have conducted an inquiry into the reason the juror was sleeping, how much testimony the juror had missed, and whether the juror was unable to perform his required duties. This claim of trial-court error "is not preserved for our review because [Appellant] did not raise any objection below to the trial court's handling of the juror issue," and "this is not the kind of alleged error for which plain-error review is available." *Clark v. State*, 315 Ga. 1, 5 (2) (b) (880 SE2d 201) (2022) (addressing a claim that the trial court should have sua sponte investigated a juror-misconduct issue). See also *Mathis v. State*, 293 Ga. 837, 838 (2) (750 SE2d 308) (2013) (holding that a challenge to the trial court's failure to question a sleeping juror was "waived" where "counsel made no contemporaneous request for the trial court to conduct an inquiry

31

and later declined to move to excuse the juror").

7.    Appellant argues that the trial court abused its discretion in failing to grant a motion for mistrial based on improper remarks made by the prosecutor during closing arguments. We disagree.

Although closing arguments were not transcribed,  the record reflects that Appellant joined Jenkins's motion for mistrial when, according to Jenkins's counsel, the prosecutor improperly commented on the defendants' right to remain silent by talking about "Rosenau[ ] not coming forward, not calling the police, [and] not talking to the police." The trial court denied the motion but gave a curative instruction, charging the jury as follows:

> Members of the jury, the Prosecutor made some remarks during their closing right before the break we just took in which you might draw an inference that there was something required of the Defendants to say or do prior to, during, and after the incident in question. I will instruct you now, and I will instruct you again during the charge conference *(sic)* later on that the Defendants are not required to present anything – no evidence, no testimony, anything through themselves or through others. And, you will draw no inference, harmful to any of the Defendants, for their failure to make any comments or do anything that was stated prior to this case. No comments that they didn't make prior to, during, or after,

nor their right to testify in this case. And, I've already cautioned, admonished the Prosecutor, not to pursue that line of argument going forward.

Following this instruction, Appellant renewed his motion for mistrial, and the trial court denied it.

The record indicates that, later in the State's closing argument, the prosecutor made some comments about sentencing, although it is difficult to discern precisely what was said because closing arguments were not transcribed. First, in an apparent reference to a remark about Davis, Appellant's counsel objected that it was "not in evidence that she's getting off scott free," and the court instructed the jury that "[t]here's no evidence she's getting off scott free. Remember what you heard, the testimony, ladies and gentlemen." Second, the record suggests that the prosecutor may have made remarks about his intention to indict Davis in the future, to revoke Lofton's plea deal due to false testimony, and to obtain a longer sentence for Lofton. Appellant's counsel objected to these remarks, arguing that the court needed to instruct the jury that it must make its findings based on the evidence and not any future prosecution.

The trial court then instructed the jury "that testimony of leniency must be based upon the evidence that you heard in this trial during the testimony from the witness stand, and not about what might happen in the future." Defense counsel did not object to this curative instruction or move for a mistrial based on any statements the prosecution may have made about sentencing matters.

Appellant's argument that the trial court abused its discretion in failing to grant a mistrial fails. First, even assuming that the prosecutor's comments about Rosenau constituted improper comments about Appellant's silence, Appellant has not shown that the trial court abused its discretion in denying his motion for a mistrial on that ground. "A trial court has broad discretion to grant a mistrial and may consider less drastic alternatives." *Jackson v. State*, 317 Ga. 139, 145 (2) (891 SE2d 878) (2023). Further, a "trial court's exercise of its discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Monroe v. State*, 315 Ga. 767, 775 (2) (884 SE2d 906) (2023) (citation and punctuation omitted).

34

Here, the trial court promptly rebuked the prosecutor in the jury's presence and issued a curative instruction, charging the jury that they were prohibited from drawing any negative inference from the defendants' failure to make comments or to testify. We presume that jurors follow curative instructions, and Appellant has not pointed to any evidence suggesting that the jury disregarded the court's instruction. See *Parker v. State*, 309 Ga. 736, 738-739 (2) (848 SE2d 117) (2020) (holding that the trial court properly denied a motion for mistrial after a witness improperly commented on a defendant's silence because the comment was made in passing, the court instructed the jury to disregard the comment, and the defendant provided no evidence that the jury disregarded the curative instruction); *Jones v. State*, 305 Ga. 750, 755 (3) (827 SE2d 879) (2019) (same).

Nor is Appellant entitled to relief on his contention that the prosecutor's remarks about sentencing warranted a mistrial. Although Appellant objected to the prosecutor's comments about sentencing and requested a curative instruction (which he received),

35

he did not move for a mistrial based on those comments. Accordingly, this claim of error is not preserved for appellate review. See *Kessler v. State*, 311 Ga. 607, 612-613 (3) (858 SE2d 1) (2021) (holding that, where a defendant had objected and moved for a mistrial based on a prosecutor's initial comments about sentencing but only objected to the prosecutor's subsequent comments about sentencing, the defendant's argument that the trial court erred in failing to grant a mistrial was not preserved with respect to the latter comments).

8.   Citing *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963), Appellant argues that the State violated his due process rights by failing to disclose an immunity agreement it had with Davis. But as explained below, the trial court found that no such immunity agreement existed, and Appellant has not shown that the trial court's finding was clearly erroneous.

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373

36

U.S. at 87. "This includes the suppression of impeachment evidence that may be used to challenge the credibility of a witness." *Danforth v. Chapman*, 297 Ga. 29, 29 (2) (771 SE2d 886) (2015) (citing *Giglio v. United States*, 405 U.S. 150, 154-155 (92 SCt 763, 31 LE2d 104) (1972)). Accordingly, "the State is under a duty to reveal any agreement, even an informal one, with a witness concerning criminal charges pending against that witness." *State v. Thomas*, 311 Ga. 407, 414 (3) (858 SE2d 52) (2021) (citation and punctuation omitted).

A *Brady* claim requires a defendant to show that (1) "the State possessed evidence favorable to the defendant," (2) "the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence," (3) "the prosecution suppressed the favorable evidence," and (4) "had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different." *Thomas*, 311 Ga. at 414 (3) (citation and punctuation omitted). "We review the trial court's factual findings regarding a *Brady* claim under the clearly erroneous standard," id.,

"meaning we accept the court's factual findings if there is any evidence to support them." *Price v. State*, 313 Ga. 578, 582 (872 SE2d 275) (2022). Cf. *State v. Rosenbaum*, 305 Ga. 442, 449 (2) (826 SE2d 18) (2019) (noting that, when a trial judge sits as the trier of fact and hears evidence, "his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them" (citation and punctuation omitted)).

The record in this case contains conflicting evidence about whether Davis was offered immunity in exchange for her testimony at Appellant's trial. Some evidence in the record points to the possible existence of an immunity agreement. For example, at a post-trial hearing, Appellant's trial counsel testified that he believed Davis had testified at Appellant's trial pursuant to an immunity agreement with the State. And the prosecutor who handled Appellant's trial testified that he had told Davis, "[A]s long as you tell the truth you've got nothing to worry about." But other evidence in the record suggested that no such agreement existed. Specifically,

38

when asked directly if Davis was "offered any immunity for her testimony," the prosecutor unequivocally testified, "No, she was not." And when questioned at trial, Davis did not say she had an immunity agreement but instead testified that she "didn't have a choice" about whether to testify because she "was subpoenaed," that no one had told her she could be charged with murder in connection with the case, and that she did not know whether Lofton's plea agreement provided that she would not be charged. Finally, some evidence in the record could cut both ways — suggesting both the existence and the nonexistence of an immunity agreement. For example, Davis testified at trial that she was "not sure" whether she could be charged with murder in connection with the case. The prosecutor testified that, "in [his] mind," he "basically" had "made a deal with [Davis]" that he would not indict her if she told the truth. And the attorney who represented Davis during her subsequent prosecution for crimes in connection with Suggs's death testified that Davis was under a "mistaken impression" that she would be granted immunity if she testified at Appellant's trial.

In denying Appellant's motion for new trial, the trial court concluded that Appellant's *Brady* claim failed because he had not established the existence of an immunity agreement between Davis and the State. And because the record includes evidence supporting the trial court's finding that no immunity agreement existed — including the prosecutor's testimony that Davis was not offered immunity and Davis's testimony indicating that she was only testifying because she had been subpoenaed, not because she had a deal with the State — the trial court did not clearly err. See *Strother v. State*, 305 Ga. 838, 849-850 (6) (828 SE2d 327) (2019) (affirming a trial court's finding that no plea agreement existed between the State and a witness where, among other things, "[the witness] and her counsel asserted that the State had tacitly offered her a plea deal before [the] [a]ppellant's trial[ ] in exchange for her truthful testimony against [the [a]ppellant," but the prosecutors testified "that they had not made a plea offer to [the witness] before [the] [a]ppellant's trial"). Accordingly, this claim fails.

9.   Appellant challenges the denial of his motion to recuse

40

the trial court judge, Judge Robert Mack, from presiding over his motion for new trial. This claim fails.

By way of background, after Appellant's trial, the State charged Davis with several crimes related to Suggs's death. Davis pled guilty to one Gang Act violation and aggravated assault before the same trial judge who had presided over Appellant's trial, and she received a sentence of 20 years in prison with ten to serve.

Following Davis's conviction, Appellant's counsel filed a motion to recuse the trial judge from Appellant's motion for new trial based on his involvement with Davis's case. The motion to recuse was reassigned to another judge, who held a hearing on the matter. At the hearing, Appellant's trial counsel testified that, after Appellant's trial, the trial judge indicated that he thought Davis should be prosecuted, telling defense counsel and the prosecutor that Davis had helped set up the robbery that led to the murder and that she should not have received leniency. Similarly, the prosecutor from Appellant's trial testified that the trial judge asked if the prosecutor planned to indict Davis and said prosecuting her might give Suggs's

41

family some closure. Further, a prosecutor who did not work on either Appellant's case or Davis's case, testified that, sometime after Appellant's trial, the trial judge had "stopped [the prosecutor]" in a hallway outside of the judges' chambers, "asked [him] if [he] knew anything about [Appellant's] case," and "brought up Briana Davis," saying "[I]f you can get the Briana Davis case [transferred] in front of me[,] I'll make sure she gets ten years."[9]

Following the hearing, the judge presiding over the recusal motion denied the motion. The judge concluded that the trial judge's statement to the prosecution and defense after Appellant's trial and his ex parte statement to another prosecutor "may indicate that [the trial judge] formed an opinion that Ms. Davis was involved in the underlying murder." But because the trial judge had formed that opinion based on his involvement with Appellant's case, the judge

---

[9] The prosecutor reported the hallway incident to Davis's counsel, and, knowing about that incident, Davis's counsel chose not to file a motion to recuse the trial judge from Davis's case. The record in this case does not suggest that the prosecution played any role in getting Davis's case reassigned to the trial judge who presided over Appellant's case. Instead, it appears that the case was automatically reassigned under the rules of case assignment because Davis's charges and Appellant's charges concerned the same victim.

found that Appellant had "failed to introduce evidence that [the trial judge] received information from an extra-judicial source that resulted in bias or prejudice against [Appellant]." Accordingly, the judge concluded that the trial judge did not need to be disqualified from presiding over Appellant's motion for new trial.

We review a trial court's ruling on a recusal motion for an abuse of discretion. See *Mondy v. Magnolia Advanced Materials, Inc.*, 303 Ga. 764, 768 (2) (815 SE2d 70) (2018). To require disqualification of a judge, "[an] alleged bias must stem from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Barnett v. State*, 300 Ga. 551, 554 (2) (796 SE2d 653) (2017) (citation and punctuation omitted). Further, "[t]he alleged bias of the judge must be of such a nature and intensity to prevent the defendant from obtaining a trial uninfluenced by the court's prejudgment." Id. (citation and punctuation omitted).

Here, the record supported the findings made by the judge who presided over the motion to recuse. And although Appellant asserts

that the court should have granted his motion to recuse "[b]ased on the testimony at the [m]otion to [r]ecuse [hearing]," he has not pointed us to any testimony suggesting that the trial judge had a bias toward Appellant (as opposed to Davis), much less a bias toward Appellant stemming from some extra-judicial source. Accordingly, this claim fails. See *Heidt v. State*, 292 Ga. 343, 347-348 (3) (736 SE2d 384) (2013) (rejecting an argument that a trial judge needed to be disqualified based on his involvement in matters "directly related to [the defendant's] case").

10. Appellant contends that the State engaged in prosecutorial misconduct by allowing Davis to testify falsely at trial without correction. We disagree.

"The knowing use of material, false evidence by the State in a criminal prosecution violates due process, even where the falsehood bears upon the witness's credibility rather than directly upon the defendant's guilt." *Harris v. State*, 309 Ga. 599, 607 (2) (c) (847 SE2d 563) (2020) (citation and punctuation omitted). "[W]hen a defendant alleges a factually specific claim of prosecutorial misconduct, the

defendant must show actual misconduct and demonstrable prejudice to his right to a fair trial in order to reverse his conviction." *Horton v. State*, 310 Ga. 310, 326 (4) (849 SE2d 382) (2020) (citation and punctuation omitted). To establish actual misconduct, he must show that "the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony," and that "such use was material [in] that there is a[ ] reasonable likelihood that the false testimony could have affected the judgment." *Harris*, 309 Ga. at 607 (2) (c) (citation and punctuation omitted).

The record in this case shows that Davis's testimony about the events surrounding Suggs's murder generally tracked the written statement she had given to the police before trial. But the trial transcript suggests that the prosecutor was surprised by Davis's testimony about certain other matters (such as her purported lack of knowledge about the co-defendants' gang affiliations). As to those matters, the prosecutor repeatedly impeached Davis based on her prior statements to him. When asked at a post-trial hearing about

Davis's trial testimony, the prosecutor from Appellant's trial testified that Davis had "completely backtracked" on certain of her pretrial statements, that he "fe[lt] like [she] was obviously lying on the stand," and that he had treated her as a hostile witness at trial and impeached her with her prior statements.

Based on this record, Appellant's claim of prosecutorial misconduct fails. Appellant asserts that the prosecution allowed Davis to testify falsely at trial, but he has not pointed us to any evidence in the record showing that the prosecutor knowingly elicited false testimony from Davis. Nor has he identified any evidence suggesting that the prosecutor allowed false testimony to stand without correction. And the record shows just the opposite — that the prosecutor was surprised to hear Davis give false testimony about certain matters and that he repeatedly attempted to correct the record by impeaching her with her prior statements. Accordingly, Appellant has not established any "actual misconduct" on the part of the prosecution. *Horton,* 310 Ga. at 326 (4) (citation and punctuation omitted). See *McClesky v. State*, 245 Ga. 108, 113

46

(5) (263 SE2d 146) (1980) (noting that the prosecutor had not knowingly failed to correct false testimony where the prosecutor put a "prior impeaching statement . . . before the jury on direct examination").

11. Finally, Appellant raises two ineffective-assistance-of-counsel claims. To establish constitutionally ineffective assistance of counsel, "a defendant must show that his counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different." *Monroe*, 315 Ga. at 781 (6) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (II) (104 SCt 2052, 80 LE2d 674) (1984)). To prove deficient performance, a defendant "must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Beltran-Gonzales v. State*, 317 Ga. 168, 173 (3) (891 SE2d 801) (2023) (citation and punctuation omitted). "There is a strong presumption that counsel's representation was within the wide range of reasonable professional

assistance." Id. (citation and punctuation omitted). "Overcoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). "If the defendant fails to satisfy either prong of the *Strickland* test, this Court is not required to examine the other." *Monroe*, 315 Ga. at 781 (6).

(a) Appellant argues that his trial counsel was constitutionally deficient for failing to request an inquiry of the juror who, as discussed in Division 6 above, slept for a period of time following lunch on the first day of trial. But Appellant has failed to establish deficient performance. "[I]n the absence of testimony to the contrary, counsel's actions are presumed strategic." *Calhoun v. State*, 308 Ga. 146, 151 (2) (b) (839 SE2d 612) (2020) (citation and punctuation omitted). And "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Beard v. State*, 317 Ga. 842, 847 (4)

48

(896 SE2d 497) (2023) (citation and punctuation omitted).

Here, trial counsel was not asked why he failed to request an inquiry of the sleeping juror, so his decision not to do so is presumed strategic. See *Calhoun*, 308 Ga. at 151 (2) (b). And we cannot say that no reasonable attorney would have concluded that the remedial measures taken by the trial court were sufficient to resolve the sleeping issue, given that there was no indication that the juror had a problem staying awake as a general matter, the record does not indicate that the issue arose again after the single episode of sleeping, and the relevant testimony that the juror may have missed was cumulative of other trial evidence the juror would have heard. Cf. *Jackson*, 306 Ga. at 276 (5) (c) (holding that the appellant had not shown that "no reasonable attorney" would have failed to object to a prosecutor's statement in closing argument that trial counsel believed was "innocuous" and "would not impact the jury's decision" (citation and punctuation omitted)); *Mathis*, 293 Ga. at 839 (2) ("Given that the only juror irregularity alleged in this case consisted of a relatively brief, single act of dozing, we find no abuse of

discretion on the part of the trial court in concluding that its immediate remedial actions[, reminding the jurors to stay awake and instructing them to keep each other awake,] were sufficient."); *Smith v. State*, 284 Ga. 17, 22-23 (4) (663 SE2d 142) (2008) (concluding that the trial court had taken sufficient "remedial actions" to address a "single confirmed act of dozing" where the court "ask[ed] the jury to stay awake," "addressed [the sleeping] juror individually[,] and initiated changes to accommodate the juror's efforts to stay alert"). Accordingly, this claim fails.

(b)    Appellant also claims that trial counsel was ineffective for failing to object to Davis's testimony that (1) she had heard that the co-defendants were part of a gang, and (2) Rosenau told her that Appellant killed Suggs. As explained below, however, Appellant has not shown deficient performance.

At trial, Davis was asked several questions about the co-defendants' gang affiliations. Davis testified that she had "heard of [the Luxiano]" but did not "know too much about it," that she "really didn't know about [Lofton's] gang affiliation," that she had "probably

50

heard about" Rosenau's gang affiliation but "really [did not] know too much about it," that she had "heard" that Rosenau was in a position of authority over the Nine Trey Bloods, and that she had "heard about" Jenkins's affiliation with the Luxiano. When asked if she knew of any affiliation Appellant may have had with any gangs, Davis responded, "not really – kind – not really, though." Separately, Davis testified that, while driving away from Jenkins's mother's house after the shooting, "[Rosenau] said [Appellant] killed [Suggs]."

Appellant claims that trial counsel was deficient for failing to object to this testimony on the grounds that (1) Davis's gang-affiliation testimony was inadmissible hearsay, (2) Davis's testimony about what Rosenau said was inadmissible hearsay, and (3) Davis's testimony about what Rosenau said violated the Confrontation Clause. None of these claims have merit.

First, even assuming that Davis's testimony about Appellant's gang affiliation was hearsay, trial counsel was not deficient for failing to object to that testimony because it was cumulative of earlier unchallenged testimony from Sergeant McKay that

51

Appellant was a gang member. See *Rashad v. State*, 318 Ga. 199, 212 (3) (d) (897 SE2d 760) (2024) (trial counsel was not deficient for failing to object to hearsay testimony that was "cumulative of earlier unchallenged testimony"); *Clements v. State*, 317 Ga. 772, 796 (7) (a) (896 SE2d 549) (2023) (same).

Second, although Appellant asserts that trial counsel was deficient for failing to object on hearsay grounds to Davis's statement that Rosenau said Appellant was the shooter, the trial court rejected this argument based on a finding that the evidence was admissible as "[a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy." OCGA § 24-8-801 (d) (2) (E). On appeal, Appellant has not even acknowledged that ruling, much less explained why it was wrong. And we conclude that a reasonable attorney could have reached the same conclusion as the trial court. See, e.g., *Kemp v. State*, 303 Ga. 385, 393-396 (2) (b) (i)-(ii) (810 SE2d 515) (2018) (holding that statements were made in the course of a conspiracy, even though

they occurred after the victim's death, and that the statements were made in furtherance of the gang because they "could be interpreted as fostering cohesiveness with another gang member or as providing information to a fellow co-conspirator (of the criminal street gang)"). Thus, Appellant has not carried his burden to show that trial counsel was deficient for failing to raise a hearsay objection. See *Clark v. State*, 307 Ga. 537, 543-544 (2) (b) (837 SE2d 265) (2019) (rejecting an ineffective-assistance-of-counsel claim where the appellant argued that comments were inadmissible but made "no argument, much less a sufficient showing, that the trial court erred in concluding that trial counsel's decision not to object was [not] objectively unreasonable").

Finally, Appellant's claim that trial counsel was ineffective for failing to raise a Confrontation Clause objection to Davis's statement that Rosenau said Appellant was the shooter fails because Rosenau's statement, which was made as the gang members and affiliates fled from the crime scene and well before any arrests occurred, clearly was not testimonial in nature. See *Allen v. State*,

300 Ga. 500, 504 (3) (796 SE2d 708) (2017) ("Norwood's statement — which was made shortly after the crimes and before any arrests to a friend's uncle rather than to police officers investigating a crime — clearly was not intended for use in a future prosecution and cannot be considered testimonial."). Because a Confrontation Clause objection would not have succeeded, Appellant has not shown deficient performance. See *Cooper v. State*, 317 Ga. 676, 686-687 (2) (895 SE2d 285) (2023) ("[T]he failure to make a meritless objection is not deficient performance." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*