321 Ga. 427
FINAL COPY

S25A0215. DENNY v. THE STATE.

McMILLIAN, Justice.

Appellant Ashton Denny, Jr., was convicted of malice murder and other charges after he shot his half-brother Kevin Rowe in the back, killing him.[1] On appeal, Denny argues that his trial counsel rendered ineffective assistance by failing to object to the admission of the murder weapon and certain other evidence obtained from his vehicle and the scene of the crime and by failing to tender for

---

[1] Rowe died on May 28, 2020. On July 8, 2021, a Rockdale County grand jury indicted Denny for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a crime (Count 4). At a trial from May 23 through May 24, 2023, the jury found Denny guilty of all counts. On July 10, 2023, the trial court sentenced Denny to life in prison without the possibility of parole for malice murder, plus five years to serve consecutively for the firearm count; the aggravated assault count merged for sentencing purposes, and the felony murder count was vacated by operation of law.

Denny filed a timely motion for new trial on August 8, 2023, which was amended by new counsel. Following a hearing on June 26, 2024, the trial court denied Denny's motion for new trial, as amended, on August 6, 2024. Denny filed a timely notice of appeal on August 19, 2024, and the case was docketed to the term of this Court beginning in December 2024 and thereafter submitted for a decision on the briefs.

admission a certain gunshot residue report. For the reasons that follow, we affirm.

1. The evidence presented at trial showed that Denny lived with his mother and several other family members in Conyers, Georgia. On the afternoon of May 28, 2020, Denny got into an argument with Rowe at the house over a family matter, after which Rowe and other family members left to "bond and relax" at Rowe's house while Denny stayed behind. Rowe and the family returned later that night and continued "laughing," "having fun," and "enjoying each other's company"; Denny interacted very little with the family. After a while, Rowe stepped outside. Denny exited "shortly after." The rest of the family, who had remained inside, heard a "loud bang" and then banging on the door and Rowe calling for help. When they opened the door, they saw Rowe standing on the other side, holding his stomach, and saying "he shot me, he shot me," before collapsing. Denny, who was the only other person outside, immediately "pull[ed] off" in his Jeep.

Family members called 911 and applied pressure to Rowe's

wound. First responders arrived, an ambulance rushed Rowe away, and law enforcement officials conducted their investigation, which included taping off the area to secure it and interviewing the family members, who said that Denny had shot Rowe and then fled in his Jeep. At 12:02 a.m., as family members were preparing to leave for the hospital,[2] Denny returned in his Jeep, saying "what happened . . . it wasn't me," and that he left to "go[ ] after" the people who shot Rowe. His family was "very angry" and screaming, "you did it, you did it," and they yelled to the police who were still at the house, "that's him, that's him." Officers immediately apprehended Denny from his Jeep in the road in front of the house. After Denny's arrest,[3]

---

[2] Unbeknownst to the family at the time, Rowe was pronounced dead on the way to the hospital. The medical examiner who performed Rowe's autopsy determined that he died from a single gunshot to the back, with the bullet exiting his stomach.

[3] Denny was swabbed for gunshot residue, but the Georgia Bureau of Investigation was not able to perform the test because the test kit sent to them did not contain the "control strip." A gunshot residue test kit usually contains a "control and a sample that you take from the swab or whatever you take from the suspect," but the kit sent to the Georgia Bureau of Investigation only contained the sample from Denny. At trial, the evidence technician testified that he did not remember collecting a gunshot residue kit in the case but that "[s]omeone could [have], yes."

the lieutenant who oversaw the criminal investigations division arrived. By the time he arrived, "the crime scene tape was up, rop[ing] off the curtilage of the home [ ], and there was a black Jeep Liberty parked in the yard," and "first thing," he instructed one of his investigators "to go obtain a search warrant so we could search the property inside and outside the home, as well as the Jeep Liberty that was parked in the — in the yard."[4]

Officers got the search warrant signed at 3:15 a.m. and executed it at 3:30 a.m. They discovered a loaded 9mm pistol in Denny's Jeep, along with a holster and loaded magazines. A firearms trace confirmed that Denny purchased the 9mm pistol

---

[4] On cross-examination, when asked how the Jeep had gotten to the yard from the street in front of the house where it was when Denny was arrested, the lieutenant responded, "I could only speculate. . . . I don't know. I couldn't give you a definitive answer." On redirect, he explained that per policy, in a situation where a vehicle suspected to be involved in a crime was left in the road, his deputies "would move it off the street and at least allow any other emergency service vehicles to go by or persons that live within the neighborhood." On recross, he confirmed that the "standard operating procedure" would be that if the vehicle "was obstructing the roadway it would be moved" by "a deputy or somebody from [his] department." The investigator who served as evidence technician for the case testified that he did "not recall" if someone from the sheriff's department moved the Jeep.

found in his Jeep less than two weeks earlier. The box and receipt for the gun were also recovered from Denny's room. Officers also found a spent 9mm casing on the ground near the front door, and they recovered a bullet that was lodged in the door.[5] A GBI firearms analyst confirmed that the casing could have been fired from Denny's 9mm firearm and that the bullet was fired from it.

2. Denny contends that his trial counsel rendered constitutionally ineffective assistance by (a) failing to object to the admission of the murder weapon and all other evidence obtained

---

[5] Officers seized the door itself on June 5, a week after the murder, and retrieved the bullet from it at that time. On cross-examination, when asked why he would leave a "critical piece of evidence there for six or seven days before [he] collected it[,]" the evidence technician responded, "I can't recall why we had to leave the door," but "[t]he physical sight of the door did not change from the photographs that I took on that day" and it did not appear that "the hole the bullet had gone in had been manipulated in any way." The investigator who seized the door testified that it was collected days later "[b]ecause I had to get permission from the family so I could get that door and replace that door with a new door," and because "I have to get permission to use the [County's] P-card to make a purchase," and it was not "policy to leave a murder scene unsecure without a door for multiple days." The door was admitted into evidence at Denny's trial with the bullet removed by law enforcement but otherwise "in the same condition as found by the Sheriff's Office." The State also had photographs of the door admitted into evidence, which the investigator testified were a fair and accurate depiction of the front door as officers found it on the night of Rowe's murder.

from Denny's Jeep, (b) failing to object to the admission of the door, and (c) failing to tender for admission a gunshot residue report. For the reasons discussed below, these claims fail.

To succeed on a claim of ineffective assistance of counsel, Denny must show both that his counsel's performance was deficient and that such deficiency prejudiced his defense. See *Strickland v. Washington,* 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong, Denny must demonstrate that his counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Bacon v. State*, 316 Ga. 234, 239 (3) (887 SE2d 263) (2023) (citation and punctuation omitted). To establish prejudice, Denny "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022). And if Denny fails to make a sufficient showing on either the deficiency or the prejudice prong, we need not address the other prong. See *Washington v. State*, 313 Ga. 771, 773 (3) (873

6

SE2d 132) (2022).

(a) *Evidence seized from Denny's Jeep*. Denny argues that his trial counsel rendered ineffective assistance in not objecting to the admission of the murder weapon and other evidence seized from his Jeep on the ground that the Jeep was "not secured by law enforcement," and the State "did not establish a reliable chain of custody," considering that investigators did not know how Denny's Jeep was moved from the street at the time of his arrest to the yard at the time it was searched. Denny argues that there is no assurance that the items found in the Jeep were not placed there during that time period. The only authority Denny cites in arguing this—and his second—ineffective assistance claim is *Rhodes v. State*, 319 Ga. App. 684, 688 (3) (a) (738 SE2d 135) (2013), for the general principle that "[t]o show a chain of custody adequate to preserve the identity of fungible evidence, the State must prove with reasonable certainty that the evidence is the same as that seized and that there has been no tampering or substitution." Id. (citation and punctuation omitted).

7

We note at the outset that to the extent Denny articulates "chain of custody" as the ground upon which he contends trial counsel should have based his proposed objection, his argument is not that there was any problem with the chain of custody of the items after they were seized from his Jeep. Instead, Denny's argument is that the Jeep itself was not secured and monitored by law enforcement between the time of his arrest just after midnight and the time the Jeep was searched at 3:30 a.m., so as to provide assurance that the items seized from the Jeep were not planted there during that interim, and that counsel should have objected to the items recovered from the Jeep on that basis.

Denny has not shown that trial counsel was deficient in failing to lodge such an objection because he has not shown that it would have succeeded. Denny speculates that evidence may have been planted in his Jeep during the period when, according to him, it was inexplicably moved from the road to the yard. But Denny proffers no evidence whatsoever supporting this speculation or indicating that the murder weapon and ammunition were planted in his Jeep. To

the contrary, there was testimony that it was standard operating procedure for officers to move suspect vehicles out of roadways to allow emergency vehicles and other traffic to pass and that Denny's Jeep had already been moved into the yard shortly after his arrest and the area was secured with crime-scene tape. There was also evidence that Denny in fact was the registered owner of the 9mm pistol seized from his Jeep, and the receipt and box for the gun were found in his room.

We have held that when, as here, there is no evidence of tampering, mere speculation about the possible mishandling of evidence generally does not require the exclusion of evidence. See *Lewis v. State*, 306 Ga. 455, 460 (1) (b) (831 SE2d 771) (2019); *Armstrong v. State*, 274 Ga. 771, 772-73 (2) (560 SE2d 643) (2002). Instead, that argument goes to the weight of the evidence, and is for the jury to resolve. See id.; see also *McDowell v. State*, 309 Ga. 504, 506-08 (2) (847 SE2d 309) (2020) (opining that aside from being "generally misplaced," appellant's chain of custody argument for the suppression of evidence still had no merit because evidentiary

authentication requirements were satisfied, meaning "the ultimate question of authenticity is decided by the jury," and appellant's "contentions about chain of custody [went] to the weight of the evidence, not its admissibility") (citation and punctuation omitted). Given the foregoing, Denny's proposed objection to the admission of the evidence would have been fruitless, though Denny was still free to highlight the issue regarding the Jeep's movement before the jury to raise doubts about the weight the jurors should afford the evidence; trial counsel did precisely that. Because trial counsel was not deficient for failing to make a fruitless objection, this claim fails. See *Hill v. State*, 310 Ga. 180, 192-93 (8) (b) (850 SE2d 110) (2020) (failure of counsel to assist in way that "would have been fruitless . . . . did not constitute deficient performance"); *White v. State*, 283 Ga. 566, 570 (4) (662 SE2d 131) (2008) (rejecting ineffectiveness claim based on counsel's failure to make a chain of custody objection because "any such objection would have been fruitless").

(b)     *The door*. Denny next argues that because the door was not collected until a week after the shooting—a period during which

10

the door was accessible to anyone while police had no control over it or knowledge about whether it had been tampered with—trial counsel also rendered ineffective assistance in failing to object to its admission on similar chain of custody grounds. This claim also fails.

Chain of custody requirements do not apply to the period of time before police actually seize evidence and take it into custody. See *Armstrong*, 274 Ga. at 772-73 (2). Labeling aside, Denny's argument comes down to his assertion that trial counsel rendered ineffective assistance by failing to object to the admission of the physical door at trial on the ground that the State failed to establish that it had not been tampered with between the beginning of the investigation and its seizure a week later. But, similar to Denny's first ineffectiveness claim, he proffers no evidence whatsoever to even suggest that the evidence—here, the door—was tampered with in any way, and law enforcement's testimony at trial not only provided a reason for why the door was not taken immediately but also confirmed that the door did not appear to have been tampered with. See OCGA § 24-9-901; *McDowell*, 309 Ga. at 506-08 (2); *Lewis*,

11

306 Ga. at 460 (1) (b); *Armstrong*, 274 Ga. at 772-73 (2). Moreover, trial counsel testified at the motion for new trial hearing that she did not object to the door coming into evidence because it actually showed "they didn't collect it for 5 to 7 days which is bad police work to begin with," and it showed something the photographs of the door could not, that "the way [the bullet] went through the door straight was inconsistent with the way that the bullet entered Mr. Rowe's body and came out" at an angle, so she "used it to create doubt."[6] Counsel's strategic decision to forgo the proposed objection was not objectively unreasonable, and therefore this claim also fails. See *Pierce v. State*, 319 Ga. 846, 867-68 (11) (b) (907 SE2d 281) (2024).

(c) *The gunshot residue report.* At the hearing on Denny's motion for new trial, his trial counsel acknowledged that during discovery, she received a Georgia Bureau of Investigation gunshot residue report stating that "the control adhesive was not present and they could not do the test." Denny argues on appeal that because

---

[6] Trial counsel used the physical door during closing to argue to the jury that it showed the bullet's angle of trajectory did not match the State's theory.

the gunshot residue report showed that police "botched" the gunshot residue collection, that report would have suggested to the jury that any other aspect of the law enforcement investigation may have been done incompetently as well, and trial counsel rendered ineffective assistance in failing to tender the report into evidence.

Pretermitting whether trial counsel performed deficiently in that respect, Denny has not carried his burden of establishing a reasonable probability that had his trial counsel tendered the report into evidence, the result of Denny's trial would have been different. Because the report did not contain any actual test results exculpating Denny, its usefulness at trial would have been limited to Denny's conjecture that its mention of a lack of a control sample preventing testing suggested that other aspects of law enforcement's investigation may have been questionable. While this argument could have been made, it is not reasonably probable that such speculation would have resulted in a different outcome here given the strong evidence of Denny's guilt, which included that Denny argued with Rowe earlier on the day of the murder; Denny was the

13

only person known to be outside with Rowe at the time Rowe was shot; Denny immediately drove away from the scene after the shooting; multiple members of Denny's own family told police that he was the shooter; the murder weapon belonged to Denny; and the murder weapon was found in Denny's Jeep after his arrest. See *McCoy v. State*, 303 Ga. 141, 143 (2) (810 SE2d 487) (2018) (trial counsel's failure to impeach witness with particular information about factual inconsistencies did not result in prejudice where the information had only "marginal" value, trial counsel otherwise "explored" the factual inconsistencies before the jury, and the evidence of guilt was "strong"); *Baker v. State*, 293 Ga. 811, 815 (3) (750 SE2d 137) (2013) (to show *Strickland* prejudice, appellant "was required to offer more than mere speculation that, absent the counsel's alleged errors, a different result probably would have occurred at trial") (citation and punctuation omitted). Accordingly, Denny has not carried his burden of showing prejudice under *Strickland*, and Denny's final ineffectiveness claim also fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel,*

14

*Ellington, LaGrua, Colvin, and Pinson, JJ, concur.*

Decided May 6, 2025.

Murder. Rockdale Superior Court. Before Judge Bills.

*Michael E. Thompson*, for appellant.

*Alisha A. Johnson, District Attorney, Alicia C. Gant, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Eric C. Peters, Assistant Attorney General*, for appellee.