**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: May 28, 2025

S25A0658.  POLLARD v. THE STATE.

MCMILLIAN, Justice.

Ray Eugene Pollard was convicted of malice murder in relation to the shooting death of Jonathon McAfee.[1] On appeal, Pollard

---

[1] The shooting occurred on October 3, 2020. On November 6, 2020, a Baldwin County grand jury indicted Pollard, charging him with malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and interference with government property (Count 4). On December 6, 2021, the trial court entered an order of nolle prosequi for Count 4.

At a trial from December 6 through 8, 2021, a jury found Pollard guilty of all remaining counts. On December 8, 2021, the trial court sentenced Pollard to serve life in prison without the possibility of parole for Count 1. Count 2 was vacated by operation of law, and the trial court purported to merge the conviction on Count 3 with Count 2 for sentencing purposes. However, the conviction on Count 3 actually merged with Count 1 because the felony murder count was vacated. See *Miller v. State*, 309 Ga. 549, 552 (3) (847 SE2d 344) (2020) ("When there is no evidence to suggest the occurrence of an aggravated assault independent of the act which caused the victim's death, as in this case, a jury's guilty verdict on the aggravated assault merges as a matter of fact with the malice murder verdict for sentencing purposes." (cleaned up)).

Pollard filed a timely motion for new trial on January 6, 2022, which was later amended through new counsel on December 28, 2023. Following a hearing on January 3, 2024, the trial court denied the motion for new trial, as amended, on February 2, 2024. Pollard filed a timely notice of appeal on

argues that trial counsel rendered constitutionally ineffective assistance by failing to object to the admission of cell-site location information ("CSLI") obtained without a search warrant. Even assuming that trial counsel was deficient in failing to object to this evidence, Pollard has not shown that a reasonable probability exists that, but for counsel's error, the outcome of the trial would have been different, so we affirm.

1. The evidence presented at trial showed the following. Pollard and Wendy Pence were in a relationship for "[a]bout nine and a half years" before Pence ended the relationship on August 21, 2020. That night, she left Pollard's house in Acworth and drove to McAfee's house in Milledgeville. The next morning, on August 22, Pence awoke at 7:00 a.m. to Pollard "banging on the door, screaming [Pence's] name for [her] to come outside. . . [a]nd honking the horn."

McAfee's mother, who lived nearby, heard "somebody sitting on their horn, just constant . . . just screaming and banging" and saw

February 27, 2024, which was amended on February 29, 2024. The case was docketed to the April 2025 term of this Court and submitted for a decision on the briefs.

2

"somebody beating on [McAfee's] door," so she called 9-1-1. An officer arrived at the scene and made contact with Pollard, who had a loaded 9mm pistol with him. Pollard was "removed [] from the property" and told that he "wasn't allowed back." At the time, Pollard was driving a "white SUV," and the officer's body camera footage from that morning showed that his vehicle had intact taillights and what appears to be an undamaged tailpipe and muffler. Pollard continued to contact Pence "[a] lot" after this incident, and Pence eventually "[b]locked him" on Facebook and changed her phone number to prevent further communication.

Around 10:00 p.m. on October 3, 2020, McAfee was leaving his job for the night. A co-worker testified that, as they were locking up, he saw a "light-color," "SUV-type vehicle" drive through the parking lot at a "high rate of speed," coming "up around [McAfee's] truck" and then exiting the lot. This was captured by the business's surveillance camera.

Pence testified that she was making dinner at McAfee's house that night and heard McAfee's truck pull into the yard. Pence then

3

heard "a gunshot" and ran outside to find McAfee "[o]n the ground on the passenger side of his truck," bleeding from his stomach. McAfee was "screaming, 'Baby, Baby, call 911, call 911.'" Dispatch received Pence's 9-1-1 call at 10:26 p.m. McAfee's mother testified that she also heard a "very loud gunshot" and McAfee screaming, so she went over to the McAfee's house. When she arrived, Pence was on the phone with 9-1-1 and McAfee was the ground surrounded by "[a] lot of blood." McAfee was taken to the hospital by emergency services where he was ultimately pronounced dead from a single gunshot wound to his "left waistline area."

An officer who observed the scene on the night of the shooting testified that the shot "would have come from the roadway or from the direction of the roadway, because [McAfee] was hit in the lower abdomen[;] where he was found laying, he could not have been shot from behind him, because of the truck, so he was either facing the roadway or facing to his left toward the roadway." The State's expert in forensic pathology testified that "the shooter was at least five to six feet away" because there was no "gunpowder or smoke deposited

4

on [McAfee's] skin" or clothing. The State's firearms and ammunition expert testified that the bullet recovered from McAfee's body "came from a [.]30 caliber rifle."

Pence immediately expressed concern to law enforcement that Pollard might have been responsible for the shooting. She told officers that, to her knowledge, Pollard drove a white 2004 Chevrolet Trailblazer and owned a .30-30 rifle. Pence also provided them with Pollard's cell phone number.

At 11:35 p.m., Acworth law enforcement visited Pollard's house to see if his vehicle was present, but they were unable to locate it. The supervisor of the criminal investigations division then instructed one of his investigators "to seek a court order to get [Pollard's] phone records." He received "approximately 48 hours worth of phone records" – which covered the hours both prior to and after the incident and included location data from Pollard's phone. The records showed that, at 8:43 p.m. on October 3, Pollard was "on

5

I-20 east of Atlanta, [near] Moreland Avenue."[2] There was no further location data collected until 1:56 a.m. on October 4,[3] at which point Pollard was "at or very near his residence in Acworth." Officers checked Pollard's house again for his vehicle at 4:30 a.m. on October 4, and the Trailblazer was present.[4] At that time, an officer observed that "one of the taillight lenses [on the vehicle] was busted."

Beyond McAfee's house is a cul-de-sac and a Department of Transportation ("DOT") fence that runs parallel to the nearby Fall Line Freeway. As law enforcement searched the area, they "found tire tracks leading from the cul-de-sac and ultimately through a large fence" that led up to the freeway. The fence had "extensive damage," including a "very large opening that would have been sufficiently wide for a vehicle to pass through." Officers collected "a large strand of wire" near the freeway that was "consistent with the

---

[2] It was noted during trial that Pollard's Acworth house is about "[f]orty minutes" north of Atlanta.

[3] An officer testified that "[t]here's basically four ways to stop [location data] collection on a phone. . . . One is the phone goes dead, you turn the phone off, you turn off the location service on the phone[,] or the phone is damaged to the point that it is not operable."

[4] According to an officer, the drive between Acworth and Milledgeville takes "in excess of two hours."

construction of the fence." They also located a muffler in the area near the fence that "appeared to have a freshly-damaged area where an exhaust pipe would connect into one end of it" and looked as if it had been "forcibly ripped from whatever vehicle it came from." In addition, they found "some red [plastic] pieces of taillight" near the opening in the fence, which were consistent with the color and shape of the taillights on a Trailblazer.

Officers obtained an arrest warrant for Pollard and search warrants for his home and vehicle. During the execution of those warrants on October 4, law enforcement observed that Pollard's Trailblazer had "a busted taillight on the passenger side" and "significant gouging and scrapes on . . . the pillars . . . at the very, very back, where the rear window is." The vehicle was also "missing the rear muffler, and it had a damaged section to the exhaust pipe, which appear[ed] to be consistent with the muffler" that was recovered on the scene.

Inside the vehicle, officers discovered a receipt from October 3, 2020, at 8:03 p.m. for the purchase of 21.4 gallons of gas at a

RaceTrac in Acworth. However, there was "[n]ot much" gas in Pollard's vehicle – he was "almost on E." Officers did not locate a .30-caliber rifle in Pollard's house, but they did locate "two [loose] [.]30-30 rounds" in the drawer of Pollard's nightstand.

Pollard was arrested at his house on October 4 and interviewed by police the following day, during which he gave several inconsistent statements as to his whereabouts on October 3. Eventually, Pollard admitted that he went to Milledgeville "just to check on [Pence]" on the night of October 3 between 9:45 and 10:00 p.m. He maintained, however, that he stayed in his vehicle at the roadway and did not approach the house or make any attempt to contact Pence. Pollard also conceded that he ran through the DOT fence as he left the area, which caused the damage to his vehicle. Pollard told officers that he owned a .30-30 rifle but that it was "missing" and that he did not know where it was.

During the investigation, law enforcement reviewed Pollard's Facebook messages. Those messages revealed that, on September 19, 2020, Pollard sent a message to another Facebook user

discussing his relationship with Pence and saying about McAfee that "I'm about ready to kill his a\*\*." The same day, Pollard sent another message, stating, "Bro this sh\*t ain't cool the way she[']s doing me it really makes me want to go kill him." On September 20, 2020, Pollard sent a message saying, "I might why hell I will probably just shoot his a\*\* and get it over with." And on September 28, 2020, just five days before the shooting, Pollard sent a message saying, "I know but I want her back he doesn't deserve her I do and if I have to I will go kill him."

2. Pollard argues that his trial counsel was ineffective because he failed to object to the admission of the CSLI from Pollard's phone that was obtained by court order instead of a warrant. To prevail on a claim of ineffective assistance of counsel, Pollard must show that his counsel's performance was deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong, Pollard must demonstrate that his counsel "performed at trial in an objectively unreasonable way considering

9

all the circumstances and in the light of prevailing professional norms." *Denny v. State*, ___ Ga. ___, ___ (2) (___ SE2d ___) (2025) (citation and punctuation omitted). To establish prejudice, Pollard "must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different." Id. (citation and punctuation omitted). If Pollard fails to meet his burden of proving either prong of the *Strickland* test, we need not address the other part. See *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022).

Assuming without deciding that trial counsel was deficient in failing to object to the admission of the CSLI, and that if counsel had objected, the trial court would have excluded the evidence, Pollard has not argued in his brief – nor is it apparent to us – that any such deficiency prejudiced him. The evidence of Pollard's guilt, as described above, was extremely strong. In particular, Pollard admitted that he was at the scene of the shooting and that he drove through the DOT fence as he left. Also, the physical pieces of his vehicle found at the scene confirmed that Pollard was there and

indicated that he fled with urgency. Pollard lied repeatedly to police about his whereabouts on the night of the shooting, and although he eventually conceded that he was at the scene, the story he provided of going to "check on" Pence could be reasonably disbelieved by a jury. And his history of threatening behavior toward Pence and McAfee – shown on August 22 and through his Facebook messages – was evidence of his intent to kill McAfee. Compared to the other evidence against Pollard, the CSLI had little probative value because it showed only that his phone was turned off or dead during the hours of the shooting. We cannot say that, without the introduction of the CSLI evidence, "the decision reached would reasonably likely have been different." *Strickland*, 466 U.S. at 696 (III) (B). Accordingly, Pollard's ineffective assistance claim fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, LaGrua, Colvin, and Pinson, JJ, concur.*