317 Ga. 139
FINAL COPY

S23A0628. JACKSON v. THE STATE.

PETERSON, Presiding Justice.

Joseph Jackson appeals his malice murder conviction for the stabbing death of Claudine Hargrove.[1] Jackson argues that (1) the trial court erred in failing to take curative action after the prosecutor commented on his post-arrest silence by questioning him about why he waited until trial to assert that he acted in self-defense; (2) trial counsel was ineffective for failing to move for a mistrial after this questioning; and (3) the cumulative harm from these errors warrants a new trial. Given the overwhelming evidence of guilt, we conclude that any error by the trial court in failing to take some

---

[1] The crime occurred on the night of August 10, 2018. In October 2018, a Gwinnett County grand jury indicted Jackson and charged him with malice murder, felony murder, and aggravated assault. After a jury trial in April 2022, the jury found Jackson guilty on all counts. He was sentenced to life without the possibility of parole on the malice murder count, and the remaining counts were vacated by operation of law or merged for sentencing purposes. Jackson timely filed a motion for new trial. The trial court denied the motion in January 2023, and Jackson timely filed a notice of appeal. Jackson's appeal was docketed to this Court's April 2023 term and submitted for a decision on the briefs.

corrective action was harmless, trial counsel was not deficient in failing to move for a mistrial because such a motion would have been futile, and there were not multiple errors to assess cumulatively. Therefore, we affirm.

The trial evidence showed the following. In August 2018, Jackson and Hargrove lived together at an extended-stay hotel in Gwinnett County. Jackson's father and brother were also staying at the same hotel but in a different room.

On the night of August 10, Jocelyn Walker, who was staying in a room next to Jackson and Hargrove, heard a man and a woman arguing in Jackson and Hargrove's room. Walker testified that she initially heard "fussing" but soon heard what seemed like furniture moving and "pounding" and "kicking" on the walls. Walker could not hear what the man was saying, but she heard the woman say repeatedly, "I'm not lying." Walker called security, saying, "[T]his is not a fight . . . I think she's getting beat down." As she waited for security to arrive, Walker heard the woman next door say, "Oh, no; oh, my God, no; oh, my God."

2

When a security guard arrived, he was directed to Jackson and Hargrove's room. He knocked on the door and stayed there for about a minute. Walker heard the security guard talking to someone. The surveillance video from the hotel does not show the door ever opening while the security guard was there. Walker later looked out her window and saw a man with a dripping towel wrapped around his left hand.

At some point that night, Jackson's father went to Hargrove's room because security informed him that there had been complaints of an argument coming from that room. Jackson left the room, quickly shutting the door behind him, and walked with his father to his father's room, at which point Jackson's father noticed that Jackson's hand was bleeding. Jackson's father grabbed a towel and asked Jackson what happened, but Jackson refused to talk about it. Jackson called his brother and said he was bleeding from several injuries to his hands, but Jackson did not mention how he sustained those injuries or that Hargrove had been injured in any way.

Jackson called 911 for his bleeding hand. A responding medic

noticed severe lacerations on Jackson's hands that Jackson claimed were sustained while doing a magic trick with a knife. A police officer arrived shortly thereafter and found Jackson in an ambulance with his hands wrapped with a bandage soaked with blood. The police officer asked Jackson what happened, and he responded that he had cut himself "doing knife tricks" and denied that he had been attacked. Jackson provided no other information and was transported to a hospital. There, he told medical providers that he was injured while doing a magic trick.

While Jackson was at the hospital, his brother asked security to check Hargrove's room because he was still concerned about Jackson's phone call and wanted to know what happened at the hotel. No one responded to knocks on the door, so security opened the door, went inside the room, and found Hargrove on the floor. Security called 911, and police found Hargrove's dead body on the floor next to the bed and a knife blade under her body. The blade was about 7.5 inches long, was bent, and was covered in blood. The handle was located on a nearby table.

4

After Hargrove's dead body was found, a detective interviewed Jackson at the hospital. Other than the injuries to Jackson's hands, the detective did not notice any other injuries to Jackson, and Jackson never reported any. After asking some background questions and getting more detailed information about the claimed knife trick, the detective asked Jackson whether anyone else was with him at the time he was injured. Jackson said he was alone in his room at the time. The detective informed Jackson that Hargrove had "a cut on her" and asked Jackson if he knew anything about it. Jackson began asking questions about Hargrove's injury suggesting that he did not know anything about it, at which point the detective read Jackson his *Miranda*[2] rights. After asking more questions about Hargrove and being informed that she had died, Jackson said he did not want to speak any more and then invoked his right to counsel, ending the interview.

Hargrove's autopsy revealed 13 different cut and stab wounds, with many injuries to the left side of her body, including her face,

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

neck, and chest. One stab wound severed her carotid artery and was so large that her spine was visible. Another stab wound completely severed Hargrove's jugular vein, and another reached her heart. These wounds would have caused massive blood loss and death within minutes. Hargrove also sustained wounds to her hand and arm that were consistent with defensive wounds and had fractures to her nose and jawbone that were determined to have occurred around the time of her death. The medical examiner determined that the cause of death was sharp-force injuries to the neck and chest, with other significant conditions being sharp-force injuries to the head and arm and blunt-force trauma of the head and face.

Jackson testified at his trial and claimed that he acted in self-defense. Jackson said that Hargrove had been drinking, became upset by something he said about her children, grabbed a knife, and swung it at him. Jackson stated that he grabbed the knife blade, causing the cut to his hand, and that a struggle ensued, during which time he began "passing out." Jackson said he punched Hargrove a couple of times, gained control of the knife, and began

6

swinging "aimlessly" at her. On cross-examination, Jackson admitted that he lied to everyone he talked to following the stabbing when he reported that he was injured doing a knife trick. Jackson also "guess[ed]" that he had enough strength to break bones in Hargrove's face despite feeling like he was about to pass out. Later, the following exchange occurred:

> PROSECUTOR: And you would admit, Mr. Jackson, that in four years [from the time of the crime to the time of the trial], this is the first time you have told anybody that this was self-defense?
> JACKSON: That it was — I never talked about it to anybody except my lawyer.
> PROSECUTOR: But no one ever called me, right?
> JACKSON: Huh?
> PROSECUTOR: You didn't call me. Your family never contacted me. Nobody ever contacted me.

At this point, trial counsel objected, arguing that Jackson had no obligation to call the prosecutor when he was represented by counsel. Counsel also argued that the question was overly argumentative because Jackson had answered the question. "It's his constitutional right," counsel added. The prosecutor agreed to "move on," leading to the following inquiry:

PROSECUTOR: But you would agree, Mr. Jackson, that you have never told anyone from the State back then, that you killed [Hargrove] in self-defense?

JACKSON: No.

PROSECUTOR: All because you didn't want to deal with it, right?

JACKSON: Well, I just didn't trust to talk to anybody except for my lawyer.

PROSECUTOR: So you waited until now? Now's when you decided to tell everybody about self-defense?

JACKSON: I just wanted — I wanted to — I mean, I just — I don't — I guess now was — I mean when I talked — now is not the first time, like here, right this second. But talking to my lawyer, it was probably the first time.

1. Jackson argues that the prosecutor improperly "questioned [him] about this post-arrest silence" in the above-quoted cross-examination. Jackson argues that, as a result of the prosecutor's remarks, the trial court had a duty under OCGA § 17-8-75 to rebuke the prosecutor or take some other curative action, such as declaring a mistrial. Jackson fails to show that any error by the trial court entitles him to relief.

OCGA § 17-8-75 provides:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also

8

rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

Even assuming that Jackson's objection about his "constitutional right"[3] was sufficient to preserve the issue, not all of the prosecutor's questions or remarks were improper. Before he was arrested, Jackson did not remain silent, but talked to the police and others. And the prosecutor was entitled to point out inconsistencies between Jackson's trial testimony that he acted in self-defense and his pre-arrest statements that he sustained his injuries while doing magic tricks. See *Johnson v. State*, 292 Ga. 785, 788 (3) (741 SE2d 627) (2013) (permissible for prosecutor to cross-examine testifying defendant about his failure to mention his fear for his safety to police or others when defendant had talked to police without having invoked his right to remain silent); see also *Bradford v. State*, 299 Ga. 880, 887 (7) (792 SE2d 684) (2016) ("[T]he prosecutor's line of

---

[3] Counsel's objection did not identify which constitutional right he was referring to, including whether it was one based on the United States Constitution or the Georgia Constitution.

9

questioning permissibly explored the inconsistencies between appellant's trial testimony and his prior statements made to civilians on the scene and the police soon after the shooting.").

On the other hand, to the extent that some of the prosecutor's questions regarded Jackson's failure to come forward after invoking his constitutional right to counsel, this was improper. See *Doyle v. Ohio*, 426 U.S. 610, 619 (96 SCt 2240, 49 LE2d 91) (1976) ("We hold that the use [even] for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."). But even assuming that the court erred in failing to take any remedial action, such assumed error was harmless. See *O'Neal v. State*, 288 Ga. 219, 223 (2) (702 SE2d 288) (2010) (trial court's OCGA § 17-8-75 error is reviewed for harmlessness).

Although the prosecutor's questioning may have touched on Jackson's constitutional right to remain silent, Jackson's argument is not directly constitutional in nature; instead, he argues that the trial court failed to meet its statutory duty under OCGA § 17-8-75.

10

And we have reviewed such alleged errors under the nonconstitutional harmless test, under which an error is "harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020) (citation and punctuation omitted); see also *Meadows v. State*, 316 Ga. 22, 28 (4) (c) (885 SE2d 780) (2023) (applying nonconstitutional harmlessness test to trial court's failure to take curative action under OCGA § 17-8-75 after the prosecutor commented on defendant's right to remain silent).

Here, in conducting that review, we consider only the harm from comments that touched on Jackson's failure to come forward following the assertion of his constitutional right, as some of the other questioning was proper. Considering all of the evidence, as a reasonable juror would, we are convinced the error was harmless. The evidence of Jackson's guilt was overwhelming. The trial evidence pointed only to Jackson as the culprit, and Jackson admitted that he stabbed Hargrove. Although Jackson claimed at

11

trial that he acted in self-defense, the claim was not credible. Jackson's self-defense claim hinged on his own trial testimony, but that testimony was severely impeached by his prior inconsistent statements. Jackson told various people prior to his arrest that the injuries to his hands were caused by doing knife tricks, not as a result of stabbing Hargrove repeatedly, and the jury was free to use these prior inconsistent statements not only to find him not credible, but also as substantive evidence of guilt. See *Esprit v. State*, 305 Ga. 429, 437 (2) (c) (826 SE2d 7) (2019) (under the current Evidence Code, "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeachment purposes" (citation and punctuation omitted)). Moreover, even if Hargrove was the initial aggressor as Jackson claimed, a jury could easily reject his self-defense claim given that Jackson brutally and repeated stabbed Hargrove and he had no visible injuries, other than those to his hands, following that onslaught. See *Wynn v. State*, 313 Ga. 827, 839 (5) (874 SE2d 42)

12

(2022) ("[A] defendant who uses excessive force in response to the victim's use of force is not justified." (citation and punctuation omitted)). Given these circumstances, even if some of the prosecutor's questioning was improper, it was highly probable that it did not make any difference to the outcome of the case, and so any error was harmless.

2. Jackson next argues that trial counsel was ineffective for failing to move for a mistrial based on the prosecutor's allegedly improper questioning above. We disagree.

To succeed on his claim, Jackson must establish that his counsel's performance was constitutionally deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Jackson must "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Mims v. State*, 304 Ga. 851, 855 (2) (823 SE2d 325) (2019) (citation and

punctuation omitted). "[D]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Richards v. State*, 306 Ga. 779, 781 (2) (833 SE2d 96) (2019) (citation and punctuation omitted). To demonstrate prejudice, Jackson must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Mims*, 304 Ga. at 855 (2) (citation and punctuation omitted). A defendant must meet both prongs of the *Strickland* test; otherwise, his ineffective assistance claim fails. See *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015).

"When prejudicial matter is improperly placed before the jury, a mistrial is appropriate if it is essential to the preservation of the defendant's right to a fair trial." *Lynn v. State*, 310 Ga. 608, 612 (3) (852 SE2d 843) (2020). A trial court has broad discretion to grant a mistrial and may consider less drastic alternatives. See *Brown v.*

14

*State*, 285 Ga. 324, 325 (1) (676 SE2d 221) (2009). A claim based on the failure to move for a mistrial fails if a defendant cannot show that such a motion would have been granted. See *Lynn*, 310 Ga. at 613 (4) (a).

Jackson has not shown that his counsel's performance was deficient. As discussed above, the evidence of guilt was overwhelming, and his claim of self-defense was dubious at best. Although we have assumed without deciding that the prosecutor made an improper reference to Jackson's post-arrest silence, this came after the prosecutor presented evidence revealing the brutal attack on Hargrove and after Jackson admitted on cross-examination that, prior to his arrest, he had lied to police and others about Hargrove's death and the cause of his injuries. The prosecutor also permissibly commented on his pre-arrest statements, noting that he never once suggested before his arrest that he had stabbed Hargrove in self-defense. Thus, although a comment on Jackson's post-arrest silence would have been unfairly prejudicial, any such comment had very little, if any, effect on Jackson's defense given the

15

overwhelming evidence of guilt, his admission to stabbing Hargrove, and the significant evidence undercutting his justification defense. These circumstances do not show that a mistrial was required to preserve Jackson's right to a fair trial, so trial counsel was not deficient for failing to request one. See *Lynn*, 310 Ga. at 613 (4) (a); see also *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014) ("[T]he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel."); *Whitaker v. State*, 283 Ga. 521, 524 (3) (661 SE2d 557) (2008) (mistrial required when improper comment on defendant's exercise of his right to remain silent "substantially prejudice[s] the defendant in the eyes of the jury" (citation and punctuation omitted)). Accordingly, this claim fails.

3. And because there are not multiple errors to aggregate, Jackson's cumulative prejudice claim also fails. See *Lane*, 308 Ga. at 21 (4) (cumulative error claim requires that the defendant first show that "at least two errors were committed in the course of the trial" (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided August 21, 2023.

Murder. Gwinnett Superior Court. Before Judge Whitner.

*David L. Whitman*, for appellant.

*Patsy Austin-Gatson, District Attorney, Clifford L. Kurlander, Lee F. Tittsworth, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.