**FOURTH DIVISION**
**MCFADDEN, P. J.,**
**WATKINS and PADGETT, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**June 4, 2026**

# In the Court of Appeals of Georgia

A26A0245. MOREY v. THE STATE.

MCFADDEN, Presiding Judge.

After a jury trial, Carl Morey was convicted of the theft by taking of currency from Cordele Metal Works, Inc., for which his construction business worked as a subcontractor. The state's evidence showed that, with the assistance of Cordele Metal Works project manager Clint Musselwhite, he inflated his invoices.

The trial court denied Morey's motion for new trial. On appeal, he argues that he received ineffective assistance of trial counsel, but he has not shown both deficient performance and prejudice. He also argues that the trial court erred in allowing the state to present victim-impact evidence in the guilt/innocence phase of his trial, but

he has not shown harmful error. He also has not shown cumulative error. So we affirm.

1. *Facts and procedural posture*

Because Morey does not challenge the sufficiency of the evidence supporting his convictions, "we review only the evidence presented at trial that is relevant to [his] enumerations of error and any factual background needed to provide context for them." *Eaker v. State*, 315 Ga. 202, 203(1) (881 SE2d 673) (2022).

The trial evidence showed that Morey's construction business worked as a subcontractor for Cordele Metal Works, the victim in this case. Cordele Metal Works, a sheet metal fabrication company, was one of two family businesses owned by Joe Cook. Joe Cook's son, Mac Cook, was the president of the other family business and a shareholder of Cordele Metal Works.

In 2008, Cordele Metal Works purchased the assets of a business that specialized in the fabrication and installation of metal stairs and handrails in buildings. The former owner of that business, Clint Musselwhite, was a lifelong friend of Mac Cook and became a full-time employee of Cordele Metal Works managing projects involving metal stairs and handrails. Musselwhite used Morey as the exclusive subcontractor for the vast majority of those projects.

Cordele Metal Works paid Morey for his work on the projects using a tool called a "schedule of values." The schedule of values was a chart, created by either Musselwhite or, later, an estimator employed by Cordele Metals Works, that assigned dollar values to the work to be done on a job Cordele Metal Works's then-general manager, Don Barnes,[1] would use the schedule of values as a reference when approving Morey's invoices, which Morey submitted to Musselwhite. Barnes testified that he performed a "cursory check" of the invoices but that he had only a limited knowledge of the work actually performed and trusted that the work was as represented on the invoices.

In 2020, Joe Cook asked Mac Cook to look into losses at Cordele Metal Works. In Joe Cook's words, the company was "not making money when it should have" and was losing money on big jobs. Before that point, the Cooks had taken a hands-off approach to managing Cordele Metal Works for several reasons: Joe Cook was limited by a serious medical condition (he suffered from amyotrophic lateral sclerosis, or ALS); the Cooks trusted the management team in place at Cordele Metal Works; and

---

[1] Cordele Metal Works subsequently demoted Barnes.

they specifically relied on Musselwhite's experience in the stairs and handrails industry, experience that they themselves did not have.

Mac Cook's investigation into the losses uncovered concerns about Musselwhite, including Musselwhite's refusal to allow access to paperwork regarding contracts and the cost of jobs that would permit oversight. In early May 2020, Mac Cook fired Musselwhite. He asked Musselwhite to hand over his company-owned cellphone, but Musselwhite refused and left the premises with the phone. After Mac Cook reached out to law enforcement, Musselwhite returned the phone, but its contents had been erased in a "factory reset." Cordele Metals Works gave both that phone and another company-owned phone found in Musselwhite's desk to law enforcement, which used a forensic process to extract the contents of the phones, including text messages.

Some of the text messages retrieved from the phones indicated that Musselwhite and Morey had worked together to inflate Morey's invoices for subcontracting work and then give Musselwhite a portion of the amount that Cordele Metal Works paid Morey for that work. Examples of the text messages include:

4

- A May 31, 2018, text from Musselwhite to Morey, "I've got you down for $26,104 and $5,000 for myself. Don [Barnes, Cordele Metal Works's general manager] will have it in a few minutes so just be prepared for anything ok."

- A June 29, 2018 text from Musselwhite to Morey, "Did you put any extra for me in yesterday? Monday I owe the dentist $1,647," to which Morey responded, "Total will be 1000."

- An October 17, 2018 text from Musselwhite to Morey, "[I]f you see anything where we both can make extra money I need it," to which Morey responded, "Ok."

- An October 19, 2018 text from Musselwhite to Morey, "Me & [Don Barnes] had a long discussion this morning that got a little awkward. I got you're [sic] number up to over $45,000 this week but I fudged $5,000 for myself. All 3 of them freaked out when they saw how much it all was."

- An October 26, 2018 text from Morey to Musselwhite, "I need to get numbers from u so I can do invoices."

- A November 7, 2018 text from Musselwhite to Morey, "I got you down for $29,041[.] I got $4,000 in for myself[.] As long as it all passes Don's inspection," to which Morey responded, "Ok."

- A November 16, 2018 text from Musselwhite to Morey, "Are the guys done in Louisville? I was going to try and squeeze about $2,000 in that one for myself," to which Morey responded affirmatively, and then Musselwhite responded, "Ok. I'm going to put that 2k in for me then if you don't mind telling Frances," to which Morey responded "Ok. ..."

- A November 21, 2018 text from Musselwhite to Morey, "As your 5th man in eufaula last week I put in $2,750 for myself," to which Morey responded, "Ok."

- A December 13, 2018 text from Musselwhite to Morey, "I'm sinning again. You're [sic] check will be $28,086. I put in $3,000 for me."

- A December 21, 2018 text from Musselwhite to Morey, "If they ask, you got 5 guys over there and not 4. I'm trying to get me a $1,000 for my trip next week," to which Morey responded, "Ok."

- A January 11, 2019 text from Musselwhite to Morey, "I added $50,000 to your Theory West numbers. Don ain't see it yet so let's see what happens. $25,901 is what I got you in for today. I put $2,500 for myself but if you need to be as close to $25,000 as you can I'll change mine to $1,000," to which Morey responded with a "thumbs up" emoji, and then Musselwhite responded, "Or if you wanta do $5k I'll take that [thumbs up]."

- A January 24, 2019 text from Musselwhite to Morey, "I added a few hours to DR Phillips so I could get an extra $500," to which Morey responded, "K."

- A January 31, 2019 text from Musselwhite to Morey, "$43,445. If I'm worker number 5 that's $4,090. I'll turn it in tomorrow morning. Be prepared cuz he's going to stroke out with a million questions and I'm sure try to beat ya down some," to which Morey responded, "Well you need to help me cause it's all legit #5." Musselwhite then texted, "#5 understands what #4 is saying," and Morey responded, "Lmao," slang for "laughing my a** off." See https://www.dictionary.com/browse/lmao (retrieved May 17, 2026).

- A February 14, 2019 text from Musselwhite to Morey, "I put $1,000 in for myself tomorrow. I did an extra $700 at Dr. Phillips and $300 at Old 4th Ward," to which Morey responded, "Ok."

- A February 21, 2019 text from Musselwhite to Morey, "I got you in at $31,640 & I put $5,000 in for me. Just had another long talk with Don again about this T & M work. Feel pretty sure he's not gonna call you & question you over it. He seemed to be satisfied after I was done talking."

- A March 1, 2019 text from Musselwhite to Morey, "I turned in $22,168 for the week. He hasn't questioned anything yet. I put 44,800 in for the embeds @ Old 4th Ward," to which Morey responded, "Ok."

- A March 15, 2019 text from Musselwhite to Morey, "Turned in $29K & something. Put #4 & #5 in for $4,800 for welding embed angles at Old 4th Ward."

- An April 4, 2019 text from Musselwhite to Morey, "$35,995 for the week. I put $5,000 in for #5. The check total will be $39,995," to which Morey responded, "Ok."

- A May 1, 2019 text from Musselwhite to Morey, "I turned in over $66,000[.] $2,000 for #5."

The dollar amounts mentioned in the texts matched amounts that bank records showed Morey had paid to Musselwhite. In total, Morey paid Musselwhite more than $177,000.

Morey testified at trial and denied stealing any money from Cordele Metal Works. He disputed the state's interpretation of the texts, testifying that the texts instead referred to payments Morey made to Musselwhite for part-time work that Musselwhite performed for Morey's construction business, helping him with tasks such as filling out invoices and other paperwork. Mac Cook and Cordele Metal Works's general manager testified that they had no knowledge of Musselwhite working part-time for Morey in addition to his full-time job at Cordele Metal Works, and they testified that such part-time work would have been a conflict of interest under the circumstances.

The state jointly charged Morey and Musselwhite with theft by taking, both individually and as parties to the crime. Morey was tried separately from Musselwhite,

and the jury found him guilty of the charged crime. The trial court entered judgment on the jury's verdict and denied Morey's motion for new trial.

2. *Ineffective assistance of trial counsel*

Morey argues that his trial counsel rendered ineffective assistance in various ways. To prevail on this claim, Morey "must show that his counsel's performance was deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different." *Cross v. State*, 377 Ga. App. 764, 776(4) (922 SE2d 447) (2025) (citation and punctuation omitted). If an appellant does not satisfy both prongs of this test, his claim of ineffective assistance fails. *Jackson v. State*, 317 Ga. 139, 145(2) (891 SE2d 878) (2023). "In reviewing a claim of ineffective assistance, we give deference to the trial court's factual findings and credibility determinations unless clearly erroneous, but we review a trial court's legal conclusions de novo." *Grant v. State*, 295 Ga. 126, 130(5) (757 SE2d 831) (2014).

(a) *Alleged cognitive impairment of lead counsel*

Morey argues that he received ineffective assistance of trial counsel because his lead counsel was experiencing cognitive impairment during the trial. In support of this

claim he points to testimony given at the hearing on his motion for new trial by his other trial counsel (a civil attorney who had represented him in a related civil proceeding and was brought into the criminal case shortly before trial, hereinafter "co-counsel"), and Morey's wife.

When asked at that hearing about lead counsel's functioning during trial, co-counsel responded: "I think as we all get older, we slow down a little bit, and he seemed kind of slow with some things, but I imagine maybe I did too. I don't know." And when asked if he saw lead counsel fall asleep during trial, he responded: "There was a point in time where I believe he was — he may have been asleep. I wasn't sure[.] ... I saw him sitting there, but I could not tell whether he was just sleeping and had his head down because he was further back from me[.]"

Morey's wife testified at the new-trial hearing that, leading up to the trial, she had concerns about lead counsel's abilities, which led her to ask co-counsel to assist in the criminal trial. Specifically, lead counsel had confused Morey's name with that of his co-indictee, Musselwhite, and did not appear to understand the schedule of values, which was central to Morey's defense that he merely invoiced Cordele Metal Works what he was owed for the subcontracting work. Morey's wife also testified that,

during the trial, she had to remind lead counsel of things and she was concerned about his "medical condition, sleeping condition[.]"

After hearing this testimony, the trial court made factual findings regarding lead counsel's condition in the order denying the motion for new trial. The trial court found that Morey had not shown lead counsel was "actually asleep" during trial because the evidence on that issue was too speculative. And the trial court found that "there was absolutely no evidence whatsoever to support ... a claim" that lead counsel was suffering from a cognitive impairment.

As stated above, we must defer to these factual findings unless they are clearly erroneous. *Grant*, 295 Ga. at 130(5). The testimony of Morey's co-counsel and wife, recounted above, does not compel findings that lead counsel was either asleep or cognitively impaired during trial, so we find no abuse of discretion. Consequently, Morey has not shown that his trial counsel was deficient in this regard.

(b) *Failure to object to alleged victim-impact and character evidence*

Morey argues that his trial counsel were ineffective for failing to object to evidence that Cordele Metal Works and the other family business owned by Joe Cook

paid bonuses to their employees based on the businesses' profits. At trial, Mac Cook testified:

> Anytime we make a profit, we give away, to our employees, as much as we can. Something my dad's always done, and he's taught me to do through the years is the employees are the ones that make the money for us, and we've got good employees, and we want to treat them right, and so, not only do we pay them what they're assigned to get every Friday, when we make money in a year, we will get with our accountant, see how much we can give away, and we give that to all the employees ... at both companies.

Mac Cook also testified that Cordele Metal Works had between 24 and 27 employees. Joe Cook testified,"any year that we are profitable, I give away the majority of our net profits to my employees" in the form of bonuses. Morey asserts that this evidence was objectionable because it raised the issues of the good character of the Cook family and the harm the alleged theft had on Cordele Metal Works, its employees, and their families.

Assuming without deciding that the testimony was, in fact, objectionable for those reasons and that trial counsel were deficient for failing to make those objections, Morey has not shown that he was prejudiced. "The burden of showing a reasonable

probability that the outcome would have been different but for counsel's deficient performance, though not impossible to carry, is a heavy one." *Revere v. State*, 302 Ga. 44, 49(2)(a) (805 SE2d 69) (2017) (citation and punctuation omitted). And we must consider the totality of the evidence in making a prejudice determination. Id. That evidence includes Morey's admission that he made the payments to Musselwhite (including, in 2019, payments that exceeded Musselwhite's salary as a full-time employee of Cordele Metal Works); bank records temporally connecting those payments with the texts found on Musselwhite's phones; and the texts themselves, which are associated with Morey's requests for payment from Cordele Metal Works. In light of the totality of the evidence, we find no reasonable probability that the outcome of this case would have been different had trial counsel objected to the testimony that the Cook family gave bonuses to Cordele Metal Works employees out of the company's profits and the testimony about the number of employees at Cordele Metal Works who presumably received those bonuses.

(c) *Failure to object to the testimony of Joe Cook*

In addition to his argument regarding Joe Cook's specific testimony about the employee bonuses, Morey also argues that his trial counsel were ineffective for failing

14

to object to Joe Cook testifying at all, on the ground that the testimony was merely cumulative of the testimony given by his son, Mac Cook, and was offered solely to garner sympathy from the jury. We disagree.

Joe Cook was the owner and chief executive officer of Cordele Metal Works, the victim in this case. As mentioned above, he suffered from ALS, and due to physical limitations caused by that condition he testified via Zoom rather than appearing in court. At the beginning of his testimony, Joe Cook explained that he was 76 years old, that he had ALS, and that he had been confined to a reclining chair for nearly ten years due to partial paralysis that caused him to be in extreme pain if he stood or sat up for more than a few minutes. He then proceeded to testify about the management of Cordele Metal Works and the investigation that led to discovery of the alleged theft.

There is no question that Joe Cook's testimony was relevant to the issues in this case. See generally OCGA § 24-4-401 (defining "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"). A trial court may exclude relevant evidence "if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. While there was some overlap between the testimony of Joe Cook and that of Mac Cook, it was not "so 'needlessly cumulative' as to warrant its exclusion under Rule 403[,]" *Naples v. State*, 308 Ga. 43, 53(2) (838 SE2d 780) (2020), especially in light of Joe Cook's unique perspective as Cordele Metal Works's owner and chief executive officer. And Morey has not shown that any unfair prejudice due to sympathy felt by the jury on account of Joe Cook's medical condition and physical limitations "substantially outweighed" the significant probative value of his testimony. OCGA § 24-4-403.

Because Morey has not shown that an objection to Joe Cook's testimony would have been successful, he has not shown that his trial counsel were deficient for failing to object. See *Lynn v. State*, 310 Ga. 608, 617(4)(c)(ii)(B) (852 SE2d 843) (2020).

(c) *Failure to object to evidence that Joe and Mac Cook trusted the Cordele Metal Works employees*

In explaining the hands-off management style at Cordele Metal Works, Mac Cook testified that he trusted the employees of that company. He also specifically

16

named Cordele Metal Works's former general manager, Don Barnes, as a trusted employee. Morey argues that his trial counsel were ineffective for failing to object to this testimony, on the grounds that it constituted impermissible character evidence and improper opinion on witness credibility. We disagree.

OCGA § 24-4-404(a), which Morey cites in support of his argument, prohibits the admission of "[e]vidence of a person's character or a trait of character ... for the purpose of proving action in conformity therewith on a particular occasion[.]" Morey has not explained how Mac Cook's testimony about trusting unnamed Cordele Metal Works employees generally or its general manager specifically fits this definition. The testimony was not offered to prove action in conformity with a trait of character on a specific occasion, but rather as part of explanations about the management style of Cordele Metal Works and about Barnes's subsequent demotion. Likewise, the testimony did not bolster the credibility of any witness, but rather addressed the general trustworthiness of employees in the workplace context. See generally *Anderson v. State*, 337 Ga. App. 739, 748(3)(c) (788 SE2d 831) (2016) ("What is forbidden is opinion testimony that directly addresses the credibility of the [witness], i.e., 'I believe

17

the [witness]; I think the [witness] is telling the truth.'" (citation and punctuation omitted)).

Because Morey has not shown that an objection to the testimony about employee trustworthiness would have been successful, he has not shown that his trial counsel were deficient for failing to object. See *Lynn*, 310 Ga. at 617(4)(c)(ii)(B).

(d) *Failure to object to evidence about a civil theft case and insurance claim*

Morey argues that his trial counsel were ineffective for failing to object when the state elicited evidence that Cordele Metal Works had also brought a civil action and an insurance claim in connection with the alleged theft. Pretermitting whether Morey accurately characterizes the evidence as "other acts" evidence inadmissible under OCGA § 24-4-404(b), he has not shown that his trial counsel were deficient for failing to make the objection. The record shows that Morey's trial counsel instead utilized those other proceedings to support their defense: pointing to a stipulation in the civil action to question Joe Cook's competency to testify at trial; attempting to impeach witnesses with their depositions from the civil action; and suggesting that Cordele Metals Works was motivated to press criminal charges because it needed a police report to assert its insurance claim. Because Morey "has failed to meet his

18

burden of showing that no reasonable counsel would have made that strategic decision, ... his ineffective assistance claim fails." *Clark v. State*, 321 Ga. 732, 738(4) (917 SE2d 71) (2025).

(e) *Failure to object to Bruton Rule violation*

Morey argues that his counsel should have objected to testimony from the lead investigator that, after interviewing Musselwhite, he sought arrest warrants for both Musselwhite and Morey. He asserts that this testimony violated the "Bruton Rule." See *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968). We disagree.

"A defendant's Sixth Amendment right to be confronted by the witnesses against him is violated under *Bruton*, when co-defendants are tried jointly and the testimonial statement of a co-defendant who does not testify at trial is used to implicate the other co-defendant in the crime." *Ardis v. State*, 290 Ga. 58, 60(2)(a) (718 SE2d 526) (2011) (citation and punctuation omitted). But Morey was not tried jointly with Musselwhite and the state did not introduce Musselwhite's statement to law enforcement or any other evidence about its actual contents. Even if the investigator's testimony referring to the statement suggested that it had implicated

Morey, the testimony did not run afoul of *Bruton*, which "excludes only the statement of a non-testifying co-defendant that standing alone directly inculpates the defendant." *Collins v. State*, 312 Ga. 727, 746 (8) (b) (864 SE2d 85) (2021) (citation and punctuation omitted). Because Morey has not shown that an objection to the investigator's testimony that Musselwhite had made a statement would have been successful, he has not shown that his trial counsel were deficient for failing to object. See *Lynn*, 310 Ga. at 617 (4) (c) (ii) (B).

(f) *Failure to object to comment on Morey's right to remain silent*

Morey argues that his trial counsel were ineffective for failing to object and move for a mistrial in response to a comment by the lead prosecutor regarding Morey's right to remain silent. During cross-examination, the lead investigator agreed that at some point before trial Morey's co-counsel had invited the investigator to discuss the case. Morey's lead counsel then asked, "did you take him up on his invitation to sit down and talk about this case?" The investigator responded by talking about *Morey's* refusal to talk with law enforcement prior to his arrest, "I invited him to do an interview with me several years or months prior to that, and he refused to talk

20

to me." Counsel clarified that the investigator was referring to Morey, and then pursued a line of questioning to provide context for why Morey might have refused to talk with law enforcement at the time of his arrest, even though his counsel later sought to speak with them.

It is not necessarily deficient performance for trial counsel not to object and move for a mistrial in response to a comment on a defendant's exercise of the right to remain silent; there may be strategic reasons for trial counsel to decline to take such action. See *Lay v. State*, 305 Ga. 715, 720(4) (827 SE2d 671) (2019). The record shows that, instead of objecting, Morey's trial counsel sought to place the lead prosecutor's comment within a larger narrative, that although Morey did not speak to law enforcement at the time of his arrest, he in fact *did* want to share his side of the story but law enforcement refused to listen to him. Because Morey "has failed to meet his burden of showing that no reasonable counsel would have made that strategic decision, ... his ineffective assistance claim fails." *Clark*, 321 Ga. at 738(4).

(g) *Failure to call Morey's wife as a witness*

Morey argues that his trial counsel were ineffective for failing to call his wife as a trial witness. At the hearing on the motion for new trial, his wife testified that, had

she been called, she would have provided additional details about the various invoices submitted by Morey's construction business for the subcontracting work he did for Cordele Metal Works, how they related to the schedules of value governing that work, and her conclusions that Morey's business "charged what we were supposed to charge" and did not charge for any work that had not been performed.

> It is well settled that the determination of which witnesses to call is a matter of trial strategy and tactics, and such strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances. And deciding whether to call a witness is normally considered a matter of strategy based in part on counsel's assessment of whether the witness would be credible.

*Park v. State*, 314 Ga. 733, 743 (2) (b) (879 SE2d 400) (2022) (citations and punctuation omitted)

Here, the decision not to call Morey's wife as a trial witness was made by Morey's lead counsel. That attorney was no longer living at the time of the hearing on the motion for new trial, and co-counsel, who did testify at that hearing, did not know the reasons behind the decision. So the record is silent as to whether lead counsel believed that Morey's wife had credibility issues or that her testimony might do more

22

harm than good. Under these circumstances, "we cannot say that the strategic decision not to call her at trial was patently unreasonable." *Park*, 314 Ga. at 744(2)(b). Consequently, Morey "has not established that trial counsel performed deficiently." Id.

3. *Victim-impact evidence*

At trial, the state asked a witness about the impact of the alleged theft on the livelihoods of Cordele Metal Works families, and the witness began to reply that it "put all the employees and their families at risk, and also Cook Industrial's," before Morey's counsel interrupted with an objection that the evidence was not relevant. The trial court overruled the objection, but the state did not elicit any further testimony on the point. Morey characterizes this as the improper introduction of victim-impact evidence and argues that it was reversible error.

"[V]ictim impact information that is not relevant to issues in the guilt/innocence phase of a criminal trial should not be admitted in that phase." *Lofton v. State*, 309 Ga. 349, 364(6)(b)(ii) (846 SE2d 57) (2020). But even if it was error to admit the testimony at issue here, we need not reverse if that error was harmless. See

*Stinski v. State*, 286 Ga. 839, 854(55) (691 SE2d 854) (2010); *Lucas v. State*, 274 Ga. 640, 643-44(2)(c) (555 SE2d 440) (2001).

"[A] nonconstitutional trial court error is harmless if the [s]tate shows that it is highly probable the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." *State v. Lane*, 308 Ga. 10, 21(4) (838 SE2d 808) (2020) (citations and punctuation omitted). Given the limited nature of the purported victim-impact evidence, we agree with the state that it is highly probable the alleged error did not contribute to the verdict against Morey. See *Stinski*, 286 Ga. at 854(55) (holding that "minor instances" of improper victim-impact testimony were harmless and did not require reversal).

4. *Cumulative error*

As to some of the above claims, we have assumed deficiency or error and decided them on the basis of lack of prejudice or harm, so we must also consider their cumulative effect. *Lane*, 308 Ga. at 17(1). We do not, however, consider the effect of matters determined not to be error. *O'Neal v. State*, 316 Ga. 264, 271(6) (888 SE2d 42) (2023).

As detailed above, as to most of Morey's claims we have found no error. But as to his claims that his trial counsel was ineffective for failing to object to purported character and victim-impact evidence, and his claim that the trial court erred by allowing other purported victim-impact evidence over objection, we assumed deficient performance or error. See Divisions 2(b) and 3, supra. Having considered these errors along with the entire record, we conclude that Morey "has failed to establish that the combined prejudicial effect of these errors require a new trial." *Jackson v. State*, 317 Ga. 95, 107(4) (891 SE2d 866) (2023).

*Judgment affirmed. Watkins and Padgett, JJ., concur.*